No. 8578.

DAVIS v. DAVIS.

1. WILLS—*Contest—Undue Influence—Evidence.* Only general rules can be prescribed as to the character and amount of evidence to establish undue influence. The evidence need not, nor can be, of the direct and positive character required to establish a physical fact. Circumstances from which undue influence may reasonably inferred suffice.

Every favorable inference, fairly deducible from the facts shown, must be considered as facts proved in favor of the contestant.

If several inferences may reasonably be made, the one most favorable to the contest must be accepted.

That the distribution of the testator's estate is contrary to natural justice, may, with other facts, be considered; but that the will is not such as the jury or the court would have made, is not sufficient to deny it probate.

It is not for the jury to determine whether the will is a just and proper distribution of the testator's estate.

The evidence examined and held to warrant the verdict of the jury in favor of the contestant.

2. —— *Probate—Questions for the Jury.* The effect of intemperance in the use of intoxicating liquors is for the jury.

3. —— *Verdict—Effect.* The verdict of a jury is of special importance, and should not be disregarded except for grave reasons clearly apparent.

4. —— *Trial Judge—Approval of Verdict.* That the trial judge has refused to disturb the verdict is entitled to consideration upon error brought.

5. —— *Attesting Witness,* may testify in favor of those contesting the probate of the will. The credit to be awarded to his testimony is for the jury.

6. —— *Habitual Intemperance.* Instruction as to the effect of, and the duty of the jury in considering the evidence, approved.

*Error to Weld County District Court, Hon. Neil F. Graham, Judge.*

Mr. JAMES W. MCCREERY, Mr. DONALD C. MCCREERY and Mr. W. T. ROGERS, for plaintiff in error.

Mr. JOSEPH C. EWING, for defendant in error.

Mr. Justice Scott delivered the opinion of the court.

ON the 23rd day of July, 1914, an instrument purporting to be the last will and testament of W. A. Davis was presented to the County Court of Weld County for probate. On the 15th day of August, 1914, a caveat was filed by John A. Davis, son and heir of W. A. Davis, objecting to its probate.

The case was tried in the County Court before a jury, and verdict and judgment rendered denying probate of the will. Appeal was taken from this judgment to the District Court of Weld County and the case was again tried before a jury, where verdict and judgment was rendered denying the probate of the will, and from which judgment the case is before us on writ of error for review. The will is as follows:

"I give to my boy, John Davis, of Fort Lupton, Colorado, ten dollars.

I give to my son, Moses, 125 shares of the capital stock of The Ione Investment Company.

I give to my daughter, Anna, 60 shares of the capital stock of the Ione Investment Company.

I give to my daughter, Nellie E., 55 shares of the capital stock of The Ione Investment Company.

I hereby appoint my son, Moses, executor of this, my last will and testament, and request that he be allowed to serve without bond."

The will was attested by Edith Thomas, Edwin W. Knowles and John T. Jacobs.

There were two grounds of protest, undue influence and mental incapacity, which latter included the specific allegation of an insane delusion on the part of the maker of the will, at the time of the execution thereof, to the effect that John A. Davis was not his son. It was charged in substance that the testator had for some years indulged in the excessive use of drugs and alcoholic liquors to the extent that his mind and body were diseased, so that he had lapses of memory, fits of unconsciousness and insane delusions; and for such reason he was unable to clearly discern and comprehend the objects of his bounty, on the date of

the making of the will.   That his mind was so impaired at the time, and that he acted under an insane delusion that John A. Davis was not his son, and for such reason disinherited the latter.   That testator executed the will under the undue influence of his children, Moses, Anna and Nellie. That these children induced and persuaded the testator to cut off the proponent from a share in the estate, and deceived and induced the testator to join with them in the organization of the corporation styled The Ione Investment Company, and, by such undue influence and deceit, caused the testator to convey his entire estate to the said company, and to give a large number of the shares in such corporation to the said three children, and to, by said purported will, bequeath all the remaining authorized shares in said corporation to the said three children.

The estate conveyed by the devisor to the corporation is estimated to have been of the value of $400,000.   The organization of said corporation is alleged to be as of the same date of the will.   The testator was approximately seventy years of age at the date of the will.   He was married to the mother of his children in 1865, the couple living together until the date of her death, about forty-five years later.   John was the eldest of the children, remained unmarried and lived at home until he was about thirty-five years of age.   The decedent settled in Weld County when John was eighteen years old, purchased a farm, and by farming and stock raising accumulated his large fortune.

The three remaining children, Moses, Anna and Nellie, continued to live with the decedent, or at least on the farm, until the time of his death.   There is no evidence of any family dissention until after the death of the mother.

John, the contestant, ceased to live at home when about thirty-five years of age, and the reason for this was his failing health, being afflicted with asthma and stomach trouble, as was his father.   He visited at the home regularly, at least until after the death of his mother.   While living at the home it appears that he devoted his time to his

father's interests, in the development and accumulation of the family inheritance.

The principal contention of plaintiffs in error is that the evidence is insufficient to sustain the verdict. The additional contention to be considered is as to alleged errors of law in instructions given and refused.

The testimony of Judge Jacobs, who drew and attested the will, forms the basis largely upon which the contestor relies. It will be observed that the will proper is contained in exactly ten lines, yet the discussion, consideration and draft occupied the entire office day, from nine o'clock in the morning until four o'clock in the afternoon.

Jacobs testified that he had been the friend and attorney of the testator for many years; that at the date of the will Davis was broken in health, and distressed in mind; that he had been in ill health for many years, suffering from asthma and stomach trouble; that his wife died about two years prior to the making of the will, and that while he had been a drinking man for some years, his wife's death was a great shock to him, and from that time on he drank heavily, which seemed to greatly affect him in body and mind. That at the time of the making of the will he was a broken down old man, was very frail, and had fainting spells. His physical and mental condition grew worse after the death of his wife. That on the day of the making of the will he broke down and cried many times. On that day Davis came to Jacobs' office about nine o'clock in the morning, and did not leave until about four o'clock in the afternoon.

Prior to the making of the will Jacobs had prepared articles of incorporation, at the behest of Davis and the three proponent children. These articles were filed on the 12th day of the month, and the organization completed on the 15th, the day the will was executed. Davis had conveyed all his property to this corporation. The authorized capital stock was four hundred shares, of a par value of $100 per share. So that the bequests were confined to shares of stock in this corporation. The testator and his

three children, Moses, Anna and Nellie, were the only persons interested in the corporation.

On the day of the execution of the will the following shares were issued: To Moses Davis, 80 shares; to Anna Davis, 40 shares, and to Nellie Davis, 40 shares. It does not appear from the record that the remaining 240 shares were ever issued to the testator, although he attempts to bequeath them by the will to the three children.

The circumstances surrounding the making of the will are detailed by Jacobs in brief and in substance as follows:

That he asked Davis how he wanted the will drawn, and he replied, "Mose wants to control the estate, and we will give him shares enough in the corporation." Two hundred and forty shares then remained for disposition. He said, "We will give Mose control, and divide the rest between Anna and Nellie, giving Anna a shade the best of it, and give John five dollars." Afterward saying he would give John ten dollars. That he then drew a rough draft of the will, in which was written, "I give to my son, John, ten dollars." When I read that to him he became very much excited, got up out of the chair, came in front of my desk and said, "Take that word son out of there." I insisted that he should be properly identified, as there might be others of the same name. He commenced to cry and became much more excited and said, "You can allude to Mose as my son, and Anna and Nellie as my daughters, but don't allude to John as my son, because he is not my son, and I am not his father." He kept on crying, and I kept arguing with him. He finally sat down in the chair and continued to reiterate that John was not his son. I asked him as to how I should allude to John. He finally said that in the South they allude to the negroes around the plantation as the master's boys, as "my boys." He said you can allude to John as "My boy, John," but it must be in that Southern sense, and that he would never consent to the use of the word "son."

The witness then drew a line through the word "son" and substituted the word "boy." That in the draft he had named Moses and Anna as joint executors; that the testator

then told him to take that out, that "Mose wants to control alone, and it won't do, it won't suit him, and will make trouble." He said, "I will make it up by giving Anna money; I can always keep her quiet with money."

The witness testifies that he argued with the testator, and urged that he ought at least to give John a few thousand dollars. He said not more than ten dollars, and repeated, "I am not his father."

Witness thought he had reference to some unnatural or unkind conduct on the part of John, and said, "Of course he is your son," but the testator said, "No, some other man must be his father than me. Since his mother died I have thought about it all the time. He is so different from me, and it must be some other man is his father." The witness then testifies as to how he undertook to argue with the testator, and to dispel the thought by presenting to him the fact of the goodness of his wife, and her faithful devotion for many years; how John and he were both alike, afflicted with asthma and stomach trouble; how their inclinations and tastes were alike; how both were interested in stock; how both were close and careful with money. All of which testator admitted, and declared he had no reason for thinking otherwise, but said, "We are so different, and I have been thinking and thinking about it." Witness testifies that the old man was, during these discussions, abject, excited, pitiful, and was weeping.

Witness finally gave up his efforts to convince the old man of his error as to the legitimacy of his son. These discussions seem, according to the witness, to have continued throughout the day. The testimony is given at great length, and contains many statements and expressions of the testator of the same general import. The witness testifies that on the particular day, the testator had been drinking, but was not drunk.

The testimony of this witness itself is sufficient to take the case to the jury upon the questions involved; undue influence and mental incapacity, which includes the question of insane delusion. From this the jury was justified in

concluding that at the date of the will, the decent was old, that he was broken down in health, afflicted with asthma and stomach trouble, and had been so afflicted for a long time. That these disabilities had become intensified by reason of the death of his wife, occurring about two years before; that he had been given to strong drink for years, and this habit grew upon him after the wife's death.

The testimony also presents strong circumstances tending to show undue influence exercised by his three children, Moses, Anna and Nellie, with whom he lived, as relates to the disposition of his property; and if it otherwise appears that there was no rational ground upon which he could conclude that John was not his son, then it proves an insane delusion upon his part, from which the jury may have justly inferred the action of disinheritance.

The circumstances of the change of the word "son" to "boy" as testified to by Jacobs, is corroborated by the stenographer in his office, to the extent that she made two drafts of the will as stated by Jacobs. But the strong corroboration is the will itself. Its very language is confirmatory of the testimony. "I give to my boy John," "I give to my son Mose." It is not probable that an experienced lawyer would so draft such a document of his own volition; that he would so refer to the decedent's children, one as "my boy," and the others as "my son," and "my daughters."

It is not even contended that there is the slightest basis in fact for the statement and contention of the decedent, that John was not his child. That John was the son of deceased, born in lawful wedlock, and that the mother was a chaste and pure woman, is admitted in the pleadings. Beside, all the testimony in the case shows that the father so recognized and treated him up to the time of the death of his mother.

In addition to this there is the undisputed fact of their living together as husband and wife for forty-five years, the rearing of other children, and the testator's great grief at her death.

Under this state of facts the jury was justified in finding that there was no rational basis for the declarations of Davis that John was not his own child, and that these declarations were the result of an insane delusion. Indeed, there does not appear to have been any circumstances or occurrences as between the testator and his son John, that to a rational mind would in any sense serve as a reason for disinheritance. John lived with and assisted the father on the farm until he was thirty-five years of age. Certainly this was sufficient in length of time to constitute a fulfillment of filial duty in that regard.

But it clearly appears that when he did undertake to do for himself, he was so afflicted, and ill, as to be no longer able to continue the kind of work demanded on the farm, and such physical condition has ever since continued. There is positive testimony that he was economical, and not the slightest evidence that he was in any way dissipated, or not possessed of good morals, or not affectionate, or not kind to his father. It does appear in a remote way that his father was not pleased with his keeping race horses, but this is trivial. The only difference appearing as between father and son was some dispute as to the settlement of the mother's estate, which was adjusted between them. A search of the record does not disclose anything indicating other than affection between them, until after the death of the mother, when testator came under the exclusive family association and influence of the other children.

That decedent was afflicted as detailed in the quoted testimony, is nowhere denied. There is ample testimony aside from that of Jacobs, that he drank to excess, even to the extent of helpless intoxication.

Indeed, it appears that Davis had executed a will some months prior to the one involved, and was afterward persuaded by Jacobs, and perhaps others, to destroy it because of his intoxication at the time of its execution, and its possible invalidity for that reason. It is true that there is conflicting testimony as to Davis' drink habits, but that fact and the resulting effects on his mind and body,

if any, were questions for the jury. As to the weakened mental, and physical condition of the decedent subsequent to the death of his wife, there is strong corroborative testimony:

B. E. Landis, a farmer and neighbor of the decedent testified in part as follows:

"Q. Do you remember when Mrs. Davis died? A. Yes, sir.

"Q. About when was that? A. In 1909, right around Christmas, I think.

Q. Did you see Mr. Davis after she died? A. Yes, sir.

Q. State what effect you noticed on Mr. Davis after his wife died. A. Well, it seemed to affect him like everything. He simply went to pieces. He has told me, 'I don't feel like the same man since my wife died; nothing seems right to me.' He said that several times to me, and in fact it appeared as if he didn't seem right in doing business with him and everything.

Q. How is that? A. He didn't appear to act right afterwards as he did before.

Q. What did you notice about him that was not right? A. Well, one thing I don't know whether it was affected by his wife or the death of his wife, he went to drinking quite recently afterwards, and he didn't seem to talk right at all and do business right with me afterwards.

Q. Go ahead. What were the things you noticed about his actions that showed he was different. A. Well, he appeared to be childish as we call it, second childhood. His age was affecting his mind or something. He didn't seem to act right or talk right. I never asked any questions of any kind about his family affairs, but simply he told me these things. He never mentioned any one of the family but Mosey to me, but not to say anything to Mosey. He seemed to be in fear of Mosey, so he talked. He never said he was, but he just says, 'Don't say anything to Mosey.' He would generally give me pretty good weight and throw in a little. I never asked him to, but he simply done it of his own will. He says, 'Say nothing to Mosey.' He says,

'This is my affair.' He says, 'I have my own business but Mosey is running the business.' He seemed to be in fear of Mosey, that he would have trouble with him. He says, 'I don't want to have any trouble with my children.'

Q. Did he cry? A. Yes, sir, several times when he spoke about his wife's death he commenced crying and he said nothing seemed right since his wife's death. He would simply cry like a child when he would be alone somewheres.

Q. You spoke about the old gentleman drinking more heavily after his wife's death. Did you ever see him much intoxicated? A. After his wife's death I did, yes, sir, quite a number of times.

Q. State some of the circumstances. State what you saw, Mr. Landis. A. Well, I simply saw him dead drunk several times, what I call that.

Q. What do you mean by dead drunk? A. Simply didn't know anything, just helpless. The last time I saw him drunk was coming home from Greeley, he was on the train and the conductor had a hard time keeping him on the train every station they stopped at. He was terribly drunk that day.

Q. Did he ever get down on the ground or on the floor? A. I have seen him full more than once.

Q. How is that? A. I have seen him full more than once, that is, down and I would help him up and he would walk alright for a little piece and stagger around."

George J. Smith was a farmer, neighbor and friend of the decedent, both were born in the same neighborhood in Wales. Smith testifies as to occurrences when both were calling upon another neighbor, and testifies concerning Davis' state of mind at a time after the execution of the will, which at least has bearing upon the question of undue influence and the prior relationship of Davis and his son John:

"A. When I chastized Mr. Davis for cutting the one boy off, and I said if I had a dozen children I wouldn't do it, he put his hands over his face and said, 'O, Argyl,

what have I done. O, God, what have I done.' That is the expression Mr. Davis used.

Q. What is Argyl? That is the word for God in Welsh. A. Yes, sir.

Q. O, Argyl, what did I do? A. Why did I do it. Why did I do it. He made that expression right afterwards, or after he said, 'O, Argyl, what have I done! Why did I do it!' And he hid his face in his hands this way (indicating). That was prior to pulling the chair up to me and telling me that John was well provided for.

Q. Was? A. Would be well provided for and the stock was all in the name as it was issued and it was going to stay in his possession until he died. That is Mr. Davis' own words.

Q. When he put his hands over his face, what was his attitude? Was he calm or otherwise. A. No, sir.

Q. What was his attitude? A. He was crying, seemed to be in a tremor, his old frame was trembling and crying.

Q. Crying much or little? A. Well, sobbing and the words were coming between sobs.

Q. What was it he said about John being provided for? A. He said, 'John will be well provided for' when we were talking about the stock being issued to the three children, and it appeared it was the primary—or on the face of the whole transaction it appeared to the community, that it was done to cut John off from any inheritance, and when I explained it to Mr. Davis in that light and showed it to him, that is when he broke down, and then he said, 'My boy, the stock will stay in my possession until I die and John will be well provided for.' I didn't ask Mr. Davis for it. He just voluntarily told me, simply as a matter of friendship and of our long standing friendship.

Q. Do you remember when Mrs. Davis died? A. I think it was four years ago this coming January.

Q. Was there a change in the physical and mental condition of the testator after his wife's death? A. Why there was a notable change in Mr. Davis as a man. I don't know exactly to tell the condition. I didn't have a great

deal of business with him and all our visits that we had were entirely social, so that I wouldn't want to say about his mental condition without I had done business with him.

Q. State the facts. What did you notice? A. I knew Mr. Davis some time after Mrs. Davis died told me that when we were talking about the loss of a friend, or a dear one, a wife or a brother, somebody who was dear to us, and he said life didn't seem the same to him since Mrs. Davis died. Sometimes he would be out in the yard and he would want to ask mammy something, and he would go towards the house after she had died as though to put a question to her or ask her a question or get her advice, and probably by the time he would reach the room where he expected to find her, then he would recall she was not there, and he said that life didn't seem the same to him; on more than one occasion he told me of making these fool journeys as though he was going to speak to Mrs. Davis when he would realize she was dead.

Q. What, if anything, did the testator say to you about his son John's ability to work? A. He said the boy's affliction was inherited from his father, that is what I told you a while ago and he is not capable and he could not stand to do a hard day's work.

Q. Did he speak bitterly in any way about his son John? A. No, sir, he always called him 'my son Johnny,' or John or Johnnie. These terms he always used to me."

The record discloses that The Ione Investment Company to whom the decedent conveyed his property was incorporated on the 12th day of December, 1911. The articles were filed with the Clerk and Recorder of Weld county on December 15th, being the date of the will.

Stock certificates were issued on the same day as follows: Nellie Davis, 40 shares; Anna Davis, 40 shares; Moses Davis, 80 shares, and on the 10th day of February, 1913, certificates were further issued as follows: Annie Davis, 60 shares; Nellie Davis, 59 shares, and Moses Davis, 121 shares. This last issue was more than sixteen months prior to the death of the decedent, and made the total issue

to the three children of the 400,000 shares, authorized by the articles.

There is no record or positive evidence, that any stock certificates were issued to W. A. Davis. On each of the certificates last issued appear the following: "Not transable" till the place is sold, or otherwise to be agreeable to all." Presumably the word "transferable" was intended by "transable." The question arises as to why these certificates were issued prior to the death of W. A. Davis, if the persons to whom they were issued were relying on the will. For, on the face of the certificates, the entire capital stock of the company was issued to the three children by the two issues, one at the time of the will, and the other subsequent to its execution, and long prior to the death of W. A. Davis.

Was the jury justified in believing that the old man was induced to sign the latter certificates, while in the privacy of their home, under the belief that the words, "Not transable" till the place is sold or otherwise to be agreeable to all," would prevent the delivery of the certificates before his death, or "as otherwise agreed."

Could he have understood that this final issue of certificates exhausted the entire capital stock of the company, and without leaving him a single share, either in his name or that he might legally control.

So we have the amazing situation of the incorporation of a company, to which was conveyed all of decedent's property; certificates for 160 shares issued to the three of the children on the same day of the execution of the will, and on that day bequeathing the remaining unauthorized 240 shares to these same children, and later and before his death the issue of this 240 shares to the same children. This is unexplained by the record, and on the face of it, with attending circumstances, strongly indicates both undue influence and mental incapacity. This was evidence, with other facts and circumstances, tending to prove both mental incapacity and undue influence.

The rule quite applicable to this case as to proof of undue influence has been well stated by our court of appeals to be:

"The chief complaint and contention of the proponent is that the evidence presented and upon which the jury based its verdict sustaining the charge of undue influence was insufficient by reason of its lacking in that affirmative and positive character which is claimed to be necessary. It follows from the very nature of the thing that evidence to show undue influence must be largely in effect circumstantial. It is an intangible thing which only in the rarest instances is susceptible of what may be termed direct or positive proof. The difficulty is also enhanced by the fact universally recognized that he who seeks to use undue influence does so in privacy. He seldom uses brute force, or open threats to terrorize his intended victim, and if he does he is careful that no witnesses are about to take note of and testify to the fact. He observes, too, the same precaution if he seeks by cajolery, flattery or other methods to obtain power and control over the will of another and direct it improperly to the accomplishment of the purpose which he desires. Subscribing witnesses are called to attest the execution of wills and testify as to the testamentary capacity of the testator and the circumstances attending the immediate execution of the instrument, but they are not called upon to testify as to the antecedent agencies by which the execution of the paper was secured, even if they had any knowledge of them which they seldom have. Only general rules concerning the amount and character of evidence required to establish undue influence in the execution of a will can be laid down. As to what is sufficient must depend upon the facts and circumstances of each particular case. These general rules have been stated and restated in many hundreds of different cases in the courts of every jurisdiction considered authority in this country. Different language is used by the different courts, but one main underlying principle, whatever phraseology is found in all, and that is, the evidence required to establish it need

not be—indeed cannot be—of that direct, affirmative and positive character which is required to establish a tangible physical fact. The only positive and affirmative proof required is of facts and circumstances from which the undue influence may be reasonable inferred." *Blackman v. Edsall,* 17 Colo. App. 429, 68 Pac. 790.

Conceding the testimony in the case to be conflicting, the circumstances appearing are clearly sufficient to justify the court in submitting the case to the jury, and likewise under the well established rule in that respect, to require this court to decline to disturb the verdict.

In the consideration of this class of cases by courts of review, there are certain well established rules to be observed. Liberally as to the admission of testimony because of the recognized difficulty, if not impossibility of establishing either undue influence or mental incapacity by direct or positive evidence, such as is required to establish a tangible physical fact, and that the only positive and affirmative proof to be expected or required, is of facts and circumstances from which undue influence or mental incapacity, may be reasonably inferred.

Further, in determining whether or not a will contest should be submitted to the jury, every favorable influence fairly deducible, and every favorable presumption fairly arising from the evidence produced, must be considered as facts proved in favor of contestants. Where evidence is fairly susceptible of two constructions, or if either of several inferences may reasonably be made, the court must take the view most favorable to the contestants. All the evidence in favor of the contestants must for such purpose, be taken as true, and if contradictory evidence has been given, it must be disregarded.

If there is any substantial evidence tending to prove in favor of contestants, all the facts necessary to make out their case, they are entitled to have the case go to the jury for a verdict on the merits. Further, that in this class of cases the verdict of the jury is of special importance and should not be disregarded, except for grave reasons clearly

apparent. This for the reason that a jury composed of the average men of the community sit together, consult, apply their separate experiences of life to the facts proven, and draw a unanimous conclusion. This average judgment thus given is the great effort of the law to obtain. It is assumed that twelve men know more of the common affairs of life than does one man, and that they can draw wiser and safer conclusions from admitted facts, thus occurring, than a single judge. It has also been observed that in the consideration of such a case the jury not only saw the witnesses, noted their language, appearance and demeanor on the stand, but that they may have been acquainted with some of the witnesses, knew their relations, present and past, and any probable interest in aiding either party, or inclination to do so. And in case like the one before us, the jury was probably acquainted with the parties.

It has further been observed by the appellate courts of this state that the fact that the trial judge has refused to disturb the finding of the jury, is entitled to consideration. In the case at bar, it appears that two juries reached the same conclusion, and that the trial judge in each instance declined to disturb the finding of the jury.

It is vigorously contended by plaintiff in error that the testimony of Judge Jacobs, attesting witness, and who drew the will is not to be credited, and should be discarded by this court, for the reason that it is in conflict with his attestation. This is not the law and there is no authority to support it. It is true that in some cases judges have sharply censured attesting witnesses, who testified in opposition to the probate of a will, and perhaps with justification in the particular instances, but the record in this case does not justify such action. There does not appear to be any inducement, save that of duty and justice, tending in any sense to cause the witness to detail the facts and circumstances appearing from his testimony. He was called in the County Court by proponents, and in the District Court by the contestor. This question has been considered by this court, and it is held that this goes no further than to the question of credibility of the witness.

In the case of In Re Shapter's estate, 35 Colo. 579, 85 Pac. 691, 6 L. R. A. (N. S.) 82, 117 Am. St. 198, it was said:

"The credibility of the witness becomes at once a matter of serious inquiry, and his desertion of his position as a sustaining witness is an important fact for the consideration of the jury."

The court correctly instructed the jury upon this point as follows:

"You are further instructed that the fact that persons identify themselves with the transaction as witnesses is an indication that in their opinion the person executing the instrument is competent to do so. The witnesses must be understood to attest not merely the act of the signing, but also the mental capacity of the testator at the time of the signing, and the fact of this attestation to the said will should be taken into consideration by you, together with all the evidence in the case, in determining whether or not the instrument presented before you is the last will and testament of W. A. Davis, deceased."

So that the jury had before it the apparent conflict in the testimony of the witness, and was instructed to take that fact into consideration.

The question of the credibility of the witness was for the exclusive consideration and determination of the jury, and in a case where the jury is duly cautioned as to the particular instance, as in this case, the finding upon that point will not be disturbed by this court.

Judge Jacobs testified that he did not want to sign the will as an attesting witness, but that the old man insisted that he do so. Further, that he was led to believe that no matter what was done, or what kind of an instrument was drawn, it would be of no importance, as the children, Nellie and Anna, purporting to speak for Moses also, had told him "that regardless of what kind of a will he made, their brother John was to have his share, and I should go on and do whatever he wanted me to do, and not bother him, and let him go ahead and do what he pleased, and after

he was dead they would give John his share, but go ahead and humor him and not cross him," so I felt what was done did not matter. That made me less careful than I would have been.

It is plain that Jacobs was a vitally important witness in the case and his testimony subjected to severe criticism throughout the trial, and in this court. The jury was cautioned by the court as to the peculiar circumstances under which his testimony was given.

We must assume that under this state of facts the jury acting within their province, gave credence to his evidence. The witness was not unknown to either court or jury; he had practiced law in the community for many years; had served as county judge in that county; had been the attorney and personal friend of the deceased for many years. A careful scrutiny of the testimony and of the record does not disclose the slightest indication of bias or prejudice on his part, for or against the parties.

Added to this is the circumstance that two courts and two juries have weighed this testimony, and have denied the probate of the will, also that the testimony of the witness given at the trial is not contradicted by other witnesses in any important particular. In the face of all these circumstances, for this court to deliberately set aside the findings of the jury because it may have been based largely upon the testimony of a particular witness, would be to overturn all precedent and to arbitrarily usurp a power which the court does not possess.

There was a sufficient number of attesting witnesses without Jacobs, which lends weight to his statement that he signed because of the insistance of the testator. The rule that an attorney drawing a will may properly testify, after the death of testator, has been asserted by this court. It was said in *In re Shapter's Estate, supra:*

"Undoubtedly, while the testator lives, the attorney drawing his will would not be allowed, without the consent of the testator, to testify to communications made to him concerning it, or to the contents of the will itself; but after

his death, and when the will is presented for probate, we see no reason why, as matter of public policy, the attorney should not be allowed to testify as to directions given to him by the testator, so that it may appear whether the instrument presented for probate is or is not the will of the alleged testator."

A careful study of the instructions given, and of those tendered and refused, discloses no substantial error in that respect. Definitions and consideration of the law concerning what constitute undue influence and want of mental capacity, together with the rules of proof in such cases, have been made sufficiently clear by the decisions of this court and the Court of Appeals, as to make it entirely unnecessary to consider the decisions of other courts relating thereto. The court in this case has kept well within the law as so expounded, and the instructions seem to leave little or nothing for discussion.

It is urged that where a will is attacked on more than one ground and a verdict found for plaintiff generally, and it is impossible to tell on which ground the verdict is reached, such verdict should not stand, if any one of the grounds are insufficient.

It is not important in this case to enter upon a discussion of this question, nor to determine it, for the reason that we must hold that there is sufficient appearing upon each ground of the complaint to sustain the verdict, and that the grounds alleged are not inconsistent.

Counsel complain particularly of instruction No. 12, which declares:

"The court instructs the jury that drunkenness itself is a species of insanity, and may invalidate a will made during a drunken fit; and long continued habit of intemperance may gradually impair the mind and destroy its faculties, so as to produce insanity of another kind; drunkenness long continued, or much indulged in, may produce on some minds, and with some temperaments, permanent derangement and fixed insanity. Whether in this case intemperate habits or drunkenness on the part of the testator have

been proved, and whether his mind was thereby affected, and as to what extent, if any, are questions of fact to be determined by the jury, from a consideration of all the evidence."

The first phrase of this instruction might well have been omitted under the testimony, but when taken with the remainder of the instruction, and other instructions given, does not constitute prejudicial error.

There was no testimony in the case indicating that Davis was in a drunken fit at the time of the execution of the will. In fact Jacobs testifies that he was not drunk, though he had been drinking to some extent. It is not conceivable that the jury could have considered any other fact in that regard, than testator's intemperate habits as these may have impaired his mind.

Counsel further object to instruction No. 20, as follows:

"You are further instructed that in determining whether decedent was capable of disposing of his property by will, you may consider that in disposing of it the testator may have distributed it unequally to the natural objects of his bounty and has bestowed it in unequal proportions to the exclusion of some one or more of them. If the testator makes a will contrary to natural justice, this, with other facts, may be considered, but the mere fact that a will is not exactly according to what our conception of justice would be or that it is not such a will as you would make is not of itself sufficient to invalidate a will."

This instruction is sustained in *Lehman v. Lindermeyer,* 48 Colo. 305, 109 Pac. 956, and in *Nelson v. Nelson,* 27 Colo. App. 104, 146 Pac. 1079. But by instruction No. 5, the court further advised the jury upon this point:

"It is not the province of the jury to determine whether a will is a just, wise and proper disposition of the testator property. It is only their province to determine whether the paper presented is in fact the will of the testator, that is, that the instrument purporting to be a will was executed at a time when his mind had sufficient capacity to know and understand what disposition he wished to make

of his property and upon whom he desired to bestow his bounty, and was not under the constraint of undue influence whereby he was not acting as a free agent in the making of his will. The testator is under no legal obligation to dispose of his property by will as the law would dispose of it, by providing equally for his children. The very right to make a will implies and presupposes the making of a will and a disposition of his property in a manner different from that provided by law."

Finding no prejudicial error occurring upon the trial of the cause, the *judgment is affirmed.*

*En Banc.*

Mr. Justice Garrigues dissents.

Decided November 5, A. D. 1917. Rehearing denied February 4, A. D. 1918.