No. 14,192.

ESTATE OF RENTFRO.

ALLEN ET AL. *v.* RENTFRO.
(79 P. [2d] 1042)

Decided May 23, 1938.

Mr. CHARLES H. WOODARD, Mr. JOHN T. ADAMS, Mr. JOHN R. ADAMS, for plaintiffs in error.

Mr. W. W. PLATT, Mr. M. M. MARSHALL, for defendant in error.

*In Department.*

MR. JUSTICE BAKKE delivered the opinion of the court.

THIS is an action involving the validity of the last will and testament of I. N. Rentfro, a sixty-one year old resident of Alamosa, who died August 2, 1935. The will was sustained by the county court, sitting without a jury, but, on appeal to the district court, a jury found that the will "is not the will and testament of I. N. Rentfro." Judgment was entered accordingly, to review which the matter is before us.

The evidence discloses that Rentfro had lived in Alamosa since 1902, his business most of the time being that of a traveling salesman for various wholesale grocery houses. He had been married twice, his first wife dying a number of years ago. A daughter was born of the first marriage, and she is the contestant here. Testator had not seen her since she was fourteen months old, and the only correspondence between them was a post card which he sent her when she was fourteen years old. He was divorced from the first wife before coming west. A short time after his arrival in Colorado, he married again. There were no children of the second marriage, and his second wife died intestate about eight months before testator. The estate was worth about $3,500. The will gives $100 to the daughter, and the rest to Mae Johnson Allen, and her son, Jackie, proponents of the will.

The grounds of contest were: (1) That the will was not legally attested; (2) that Rentfro was physically and mentally incapacitated to make a will; (3) that undue influence was exerted by Mae Johnson Allen.

1. No argument is made by contestant on the question of insufficiency of attestation, so we may consider that objection as being waived.

■ 2. On the issue of incapacity, the facts were as follows: "The deceased was a man of good habits, a hard working, good business man, and, by dint thereof, and with the aid of his wife they both together accumulated considerable property." He was ill during the early spring of 1935, but recovered. On July 21, 1935, he was stricken with the heart attack that caused his death two weeks later. When he was first taken ill in the afternoon of the 21st, he thought it was food poisoning and Dr. Byrn who was called pumped his stomach. The doctor diagnosed the illness as coronary "occulation [occlusion]" (heart attack). While Dr. Byrn was present in the afternoon, Rentfro asked him for something to write on, and the doctor picked up a card (Exhibit B) and handed it, together with a pencil, to testator who wrote on it as follows: "July 21, 1935. I give everything I own to May Allen and her boy Jacky. I. N. Rentfro." Later, that day or the next, the card was signed at Rentfro's request by Doctors Byrn and Day, and Roberta Carrell, R. N., as witnesses. This writing by Rentfro was in Dr. Byrn's presence. Doctor Byrn testified he was not certain whether Mrs. Allen was in the room or not, but that she was in the room or near it. The testator was given a sedative to quiet his pain, the exact time, whether before or after the writing, does not appear. No word was spoken by Mrs. Allen during the time Rentfro wrote on the card. When this card was offered in evidence, there was no objection on ground of mental incompetency.

The will itself was made on Wednesday evening, July 24th, with no suggested change of mental condition since July 21st. The attorney, his stenographer, and Doctors Day and Byrn were present. Mrs. Allen was not. Testator recognized attorney and stenographer, calling them by name. He told them how he wanted his will drawn, but, when asked if he had a daughter, and admitting he had, was advised to leave her something, and when asked, "Do you want to leave her $10," said, "No, leave her $100." Then the attorney and Miss Bond, the stenog-

rapher, left the room and prepared the will. On their return, the attorney read it to testator, paragraph by paragraph, the testator approving each as read. When the time came for him to sign the prepared will, he did not like the pen tendered him and called for one he was accustomed to using; being given the wrong glasses, he asked for his own. After he had written his full name, he made a few flourishes and drew the pen across the bottom, saying, "That makes it official." Dr. Byrn helped him turn over in bed. Testator requested his nurse to get his check book.

The actual signing of the will took place about 8:30 or 9:00 o'clock p. m. About 5:30 o'clock p. m. he had been given ⅛ grain of morphine, and one and one-half hours later an ampule (a small glass container for holding hypodermic solutions) of caffeine as sedatives. Medical testimony as to the effect of these drugs was that testator being a large person, the ⅛ grain of morphine would have no effect on the clearness of his mind and that the caffeine would counteract the morphine. Aside from his illness and his having been given these drugs, there is no suggestion of mental incapacity. The uncontradicted medical testimony was that testator was not mentally incapacitated at the time the will was executed by reason of the effect of the drugs administered.

3. Touching the alleged undue influence of Mrs. Allen over the testator, the facts appearing in evidence are: The families had been neighbors and friends for eighteen years. Testator had known Mrs. Allen since she was a little girl, and both he and his wife had called her "sweetheart." After Mrs. Rentfro died, the Allens became very friendly with testator. Mrs. Allen took care of and kept house for him during his illness in mid-winter. The Allens took him with them on fishing trips, and on one occasion he went with Mrs. Allen on a trip to Albuquerque. They went to the cemetery together and put flowers on the graves. July 4, 1935, at a little family gathering at testator's home, the Allen's being present,

each of them had a bottle of beer which he had purchased. Mrs. Allen sat on his lap, and he called her "sweetheart." About that time the Allens moved into testator's house to make their home with him. On Sunday, July 21st, they had all been fishing, and on their return prepared the fish for supper. They were going to have strawberries, too. Mr. Allen was shaving, and Mrs. Allen asked Rentfro to go with her for some cream to put on the strawberries, and he was stricken before they returned. Mr. Allen put him to bed, and called the doctor.

Evidence shows that testator had talked to several people about how he was going to dispose of his property. To some, he had intimated he was going to leave it to his folks; to others, he said he was going to leave it to the Seventh Day Adventist Church; and to others, he mentioned the Elks Lodge as the beneficiary.

One of the witnesses for contestant testified: "Mrs. Allen looked after Rentfro excellently, I will have to say; she cooked for him and did the housework for him; she catered to him, and did everything in her power; she was wonderful to him, and I told him it is worth $25 and he should reward her." Mrs. Allen's picture was on the piano in Rentfro's living room. Several people, old friends of testator's, were advised by Mrs. Allen that they could not see him, but the doctor had given orders to that effect. Mrs. Allen had nothing to do with the giving of the morphine or caffeine, which were prescribed by Dr. Byrn and given by the nurse.

Following testator's death, Mrs. Allen made no effort to get in touch with the daughter. Admittedly she did not know where the daughter lived.

It is not disputed that Jack Allen, the joint beneficiary with his mother under the will, was a "popular little fellow and loved by everyone."

Was there any damaging evidence against Mrs. Allen? We do not believe so. She was indebted to Dr. Day for medical services in considerable amount. She did sign the petition for letters of administration in Kate Rentfro's

estate in which Dr. Day was named as administrator. She did talk to Dr. Day about Rentfro's will in the doctor's car, parked in front of testator's house, the night the will was executed. While these facts might furnish a possible motive for Mrs. Allen's wanting Rentfro's property, they are not competent evidence on the question of undue influence here. It was Dr. Byrn who attended testator when he was stricken, and there is no suggestion of collusion between him and Dr. Day. No undue influence is alleged to have been exerted over testator by either of these men.

We do not find it necessary to further review the evidence, nor to pass upon the propriety of the submission of the issues to the jury, except as we pass on them inferentially in saying that the motion for judgment, non obstante veredicto, should have been sustained, because it is clear to us that in arriving at its verdict, the jury ignored the court's instructions as to the law.

A few examples will suffice:

"Instruction No. 6. Now what is or what is not undue influence? The degree and kind of influence necessary to be exerted over the mind and conduct of the testator, to render it undue, must, from some cause or by some means, be such as to induce the testator to act contrary to his wishes, and to make a different will and disposition of his property from what he would have made if left entirely to his own discretion and judgment. The free agency of the testator must be overcome, and he must by some domination and control exercised over his mind have been constrained to do what was against his will or what he was unable to refuse and too weak to resist. And this undue influence is not to be measured by its amount or extent, but by its fruits and results. In considering the question, therefore, it is essential to ascertain as far as practicable the power of coercion, domination and control on the one side and the liability or susceptibility to influence on the other, and whenever, through weakness, ignorance, dependence, or implicit reliance by one on the good faith of

another, the latter obtains an ascendancy which prevents the former from exercising an unbiased judgment, undue influence exists. *But mere kindness of treatment, or reasonable solicitation, entreaty or persuasion, though yielded to, if the yielding were done intelligently, and without restraint, would not be sufficient to vitiate a will.''* (Italics are ours.)

"Instruction No. 9. You are instructed that direct evidence of undue influence in procuring the execution of a will is not required to prove the existence of such undue influence. Proof of undue influence may be made by evidence of facts from which the inference of the existence of such undue influence may naturally and reasonably be drawn, and if you believe, from the evidence, that any fact or facts are proved from which the inference may be fairly and reasonably drawn that the alleged will of I. N. Rentfro was procured by undue influence operating upon him at the time of the execution of the said alleged will, then and in that case it is your duty to find that said alleged will is not the will of I. N. Rentfro.

"Instruction No. 10. You are instructed that undue influence is not proved by disclosing relations of friendship and affection between the parties, and by showing kindly offices and proper conduct on the part of the devisee.

"Instruction No. 11. You are instructed that undue influence cannot be inferred alone from motive or opportunity. There must also be testimony, either direct or circumstantial, to show that undue influence not only existed, but that it was exercised with the respect to the making of the will itself.

"Instruction No. 12. You are instructed that any man of mature age, who at the time of making his will had no wife living, whether he has children or grandchildren or not, has an absolute right to dispose of all or any of his property by his will to any person he pleases, disregarding entirely the expectations of his natural heirs, and disregarding any statements previously made of his intention to leave it to his natural heirs; that you have no right

to question the wisdom or assume the folly of the disposition which the testator chose to make of his property; that you have no right to avoid the will because you might think the testator has no sufficient excuse for giving a large share of it to Mae Johnson Allen and her son, nor because it was not such a will as you might think he ought to have made; that if he made the will without undue influence, and while mentally competent to know what he was doing, his right was absolute to give to any person he chose.

"But, while a will cannot be set aside on the mere ground that it was unjust or unnatural, such facts, however, have weight in determining whether a testator was mentally competent at the time of executing a will, or was acting under undue influence."

The evidence in this case in support of the caveat was insufficient in law; the verdict for the contestant based thereon was on immaterial issues, and the motion non obstante veredicto should have been sustained. *Cameron Brothers v. Osborne,* 69 Colo. 199, 193 Pac. 554.

It is true that there was no objection made to certain of the immaterial testimony at the time given, but that would not have precluded the trial court from sustaining the motion. *Murray, Ferris & Co. v. Blackledge,* 71 N. C. 492. ▮ *Blackman v. Edsall,* 17 Colo. App. 429, 68 Pac. 790, and *Davis v. Davis,* 64 Colo. 62, 170 Pac. 208, are of no assistance to contestant here, because the rule therein announced, that "the only positive and affirmative proof required is of facts and circumstances from which the undue influence may be reasonably inferred," has not been met by the facts and circumstances in this case.

Judgment reversed and cause remanded with instructions to dismiss the caveat, and admit the will to probate.

MR. CHIEF JUSTICE BURKE, MR. JUSTICE KNOUS and MR. JUSTICE HOLLAND concur.