[No. 5580.]

## LEHMAN v. LINDENMEYER.

1. **Evidence—Letters**—In a contest as to the probate of a will, letters found among the effects of the testator purporting to be written by a brother, are admissible to disprove the statements of the will that the testator had not heard from the brother for many years.—(310)

2. **Evidence—Opinions**—A witness should not be permitted to announce an opinion as to the effect upon the mind of a testator, of particular conduct of the legatee. The question is for the jury.—(310)

3. **Instructions—In Will Contests**—In a contest as to the probate of a will the proponent's counsel prayed as an instruction a passage quoted from a judicial opinion, enlarging upon the high value placed by the law upon the right of the owner of property to dispose of it by will at his pleasure, in order to reward those who have been affectionate, and punish the disobedient, the testators' right to indulge his prejudices, the few occasions in which the testator's disposition of his estate is satisfactory to his relatives, and the indifference of the courts to a testator's prejudices against some of his kindred, and his partiality to others. It was held properly refused, as in the nature of a homily, rather than an instruction.—(310, 311)

——An instruction that "The testator must have been capable of exercising his judgment, his reasoning faculties, and a consecutive continuation of thought," was held, where construed with the rest of the charge, to require no more than that the testator should apply to the making of his will, the judgment, reasoning faculties and memory, of one possessed of a sound mind.—(311)

In the same instruction it was declared that the testator must be "capable of understanding the reasons for giving or withholding his bounty" as to any of his relatives. Held to import no more than that the testator should be capable of understanding

(20)

why certain bequests made, were made, and why others were withheld, and to be unobjectionable.—(311, 312)

——Where undue influence is alleged it is proper to charge the jury to consider the age, and the physical and mental condition of the testator, together with the circumstances surrounding him; also to instruct that while it is not sufficient to invalidate a will that it does not accord with our conceptions of justice, yet that the will is contrary to natural justice may be taken into account.—(313)

The doctrine of In re Shell's estate, 28 Colo. 167, followed. —(314)

*Error to Denver District Court*—Hon. PETER L. PALMER, Judge.

Mr. W. E. RICHARDS, for plaintiff in error.

Messrs. BICKSLER, BENNETT & NYE, for defendants in error.

CHIEF JUSTICE STEELE delivered the opinion of the court:

The following, purporting to be the last will and testament of George Cleve, deceased, was presented for probate and record, to the county court of the city and county of Denver:

"This is the last will and testament of me George Cleve of Fort Collins, in the County of Larimer and State of Colorado, Farmer.

"1. Being of sound mind, memory and understanding I give, devise and bequeath all my real and personal estate of whatsoever nature and kind soever, and wheresoever situate unto and to my dear friend Jennie Lehman of number 2758 Humboldt Street in the City and County of Denver and State of Colorado for her own sole absolute use and benefit and I do this as some slight return to her for her loving care and her nursing of me through several severe attacks of sickness and for her devoted Christian work among the poor and outcast of the City of Denver.

"2. I appoint the said Jennie Lehman sole executrix of this my Will, and I direct her to pay all my funeral and testamentary expenses and my just debts owing by me at the time of my decease.

"3. I declare that I have a brother and some distant relatives living but inasmuch as they have ignored me and left me to my fate it is my will and intention that they shall not in any way participate in my estate.

"4. I desire that the said Jennie Lehman my said sole executrix be empowered to act in the matter of this my Will without being under the necessity of giving or procuring to be given bonds for the due performance of her duties and I desire that any court having jurisdiction of this my Will waive all such bonds.

"5. I hereby revoke all former Wills and Testamentary dispositions heretofore made by me and declare this to be my last Will and Testament.

"In witness whereof I have to this my last Will and Testament set my hand by making my mark hereto this Eighth day of October in the year of our Lord One Thousand nine hundred and three.

GEORGE<br>His  X  Mark.<br>CLEVE."

Objections were made by the heirs-at-law of the deceased upon two grounds:

(1) That at the time the writing bears date the said George Cleve was not of sound mind and memory, but by reason of his extreme age and fatal illness, was mentally incapacitated.

(2) "That the said George Cleve, if he signed said will at all was induced thereto by the undue influence of Jennie Lehman, the proponent of said will, and others to said objectors unknown, who induced said defendant by false 'misrepresentations' to be-

lieve that in executing said paper writing, he was devoting his entire property to religious and benevolent purposes, whereas said paper writing purports to give to the said Jennie Lehman all the property of said decedent, without limitation to her power to dispose of same or to appropriate the same to her own use, or to any purpose she may see fit. That other inducements were brought to bear upon said decedent, unduly and with a fraudulent purpose, which the said objectors cannot more specifically enumerate or set forth.''

The document was refused probate by the county court, and also by the district court on appeal. From the judgment the proponent appealed to the court of appeals. That court having dismissed the appeal, the case was brought here by writ of error. The assignments of error relate to the reception of testimony and the instructions, but mainly to the insufficiency of the evidence to sustain the verdict and judgment.

Before entering upon a discussion of the assignments of error, it should be stated that the decedent came to this country from England, bringing with him his wife and her niece. The niece had been taken into the family with the intention of adopting her, but no legal adoption was procured. Cleve and his wife and her niece lived upon the farm owned by Cleve, near Fort Collins, until the marriage of the niece, when she left the home of the Cleves and went to live with her husband in that immediate neighborhood; but in a short time the niece returned to the Cleve home with her husband, and lived with them for a period of twelve years. Cleve survived his wife about ten years, and about five years before his wife died the niece removed with her family to her place, a short distance from the Cleve home; but during the entire period, both before and after his wife's

death, the niece was accustomed to have general superintendence of Cleve's household affairs.

About two years before Cleve died, he came to Denver. He at first became connected with the Salvation Army, later with the Union Mission, a religious association having a place of meeting near the corner of Twentieth and Larimer streets, in this city. The mission is thus described by one of the witnesses: "A number of ladies and gentlemen, charitably disposed, are banded together, under the leadership of Miss Lehman, for the purpose of rescuing the poor and outcast in Denver." Cleve devoted nearly all of his time in furtherance of the objects of this most worthy institution. He spoke at the meetings; he contributed funds; he slept at the mission house on a mattress; he cooked his meals there; and in every way showed that he was one of the mission's most devoted adherents. He owned a horse and buggy, and would drive with Miss Lehman to the towns in the vicinity of Denver, and on one occasion, at least, visited Fort Collins with her.

Cleve had complained on many occasions of dizziness, and one of the reasons given by him to the niece for his removal to Denver, aside from his desire to learn more of the "holiness business," as he expressed it, was a belief that his health would improve if he left the farm.

During the early part of October, 1903, he was ill, and was visited several times by a physician. On the night of October 6th, he was completing his arrangements to return to Fort Collins. His condition was such that the physician refused to permit him to leave, but desiring he should have better accommodations than the mission afforded, removed him, on the morning of October 7th, from the mission house to the home of Mrs. Strickland, the sister of proponent, 2758 Humboldt street, Denver. On Octo-

ber 8th, the paper purporting to be his last will was prepared by an attorney, and Cleve's name was signed by one of the witnesses, and Cleve affixed a cross. It was shown that Cleve had not learned to write his name. Cleve died on October 13, 1903. The physician, as shown by the claim filed against the estate, was in constant attendance during October 7th, fifteen hours on October 8th, in constant attendance October 9th and 10th, and all day each day thereafter, until Cleve died.

Not all of the assignments of error are discussed, and we shall consider only those mentioned by the plaintiff in error.

The court received certain letters purporting to be from the brother of deceased, for the purpose of showing that the alleged declaration that he had not heard from his brother for more than twenty-five years was not true. As the letters were received within the period, we perceive no prejudicial error in thus admitting them.

Witnesses were asked by counsel for proponent if they had seen any indications that Miss Lehman was unduly influencing or trying to influence Cleve in the making of the will. The court, we think, properly excluded the answer. The witnesses should not have been permitted to announce their conclusions as to what effect the conduct of Miss Lehman produced. It was for the jury to determine whether undue influence was exercised after the witnesses testified to the facts.

The only requests for instructions refused by the court of which counsel complains, save the one to direct the jury, is proposal No. 2. We do not regard this as containing a proper charge to a jury. It was copied from the decision of this court in the case *In re Shell's Estate*, 28 Colo. 167. The writer of the opinion quoted it from a Pennsylvania case. It was

more in the nature of a homily than an instruction, and there was no error committed in its refusal.

It is claimed that instructions Nos. 10 and 14 are erroneous in this:  That it places upon the proponent the burden of disproving undue influence.  At the request of the proponent an instruction was given upon the subject of the burden of proof, and we are of the opinion that the instructions complained of do not, in any degree, modify or change the instruction given at proponent's request.  The following sentence found in instruction No. 10, is vigorously assailed as grossly exaggerating the mental capacity required of a testator.  "In short, the testator, at the time of making the will, must have been capable of exercising his judgment, his reasoning faculties, and a consecutive continuation of thought."

The sentence is in explanation of the preceding part of the same instruction and when considered with the other parts does not seem to us to be erroneous.

It merely requires that a testator shall be able to apply to the transaction of making a will, the judgment, the reasoning faculties and the memory of one possessed of a sound mind.  The capacity required by the instruction is not greater than that required in the cases, *Whitney v. Twombly et al.,* 136 Mass. 145, and *Estate of Motz,* 136 Cal. 558.

In the same instruction occurs the phrase, "and was also capable of understanding the reasons for giving or withholding his bounty as to any of them," and counsel say that:  "The jury must, under that instruction, have inferred that they were to search in the evidence for specific reasons why the testator passed over the contestants, and not that they were to consider any reasons assigned by him why he did so.  Finding no reasons, at least reasons which ap-

peal to them as sufficiently weighty, the jurors necessarily found the instrument in question no will.''

There is nothing in the instruction suggesting that the jury should search the evidence to find a sufficient reason for the testator to grant or withhold his bounty, and we shall assume that the jury did not do so.

The words used require simply that the testator should be capable of understanding why the bequests were made or withheld.

Woerner, speaking of the mental vigor requisite to make a will, says:

''The most accurate rule laid down in a number of States seems now to be this: 'While the law does not undertake to measure a person's intellect, and define the exact quantity of mind and memory which a testator shall possess to authorize him to make a valid will, yet it does require him to possess mind to know the extent and value of his property, the number and names of the persons who are the natural objects of his bounty, their deserts with reference to their conduct and treatment toward him, their capacity and necessity, and that he shall have sufficient active memory to retain all of these facts in his mind long enough to have his will prepared and executed; if he has sufficient mind and memory to do this, the law holds that he has testamentary capacity,' '' and we find nothing in the instructions given in this case requiring greater testatmentary capacity than that stated by Woerner. Although we approve the rule stated by Woerner, we do not wish to be understood as recommending the giving of it as an instruction in will contest cases.

Objection was made to the giving of a sentence found in instruction No. 12, upon the subject of undue influence, as follows: ''Importunity which the testator has not the will or strength to resist, and to

which he yields for peace and quiet, if carried to a degree in which the testator's judgment, discretion, or wish is overborne, will constitute undue influence, though no force is used or threatened," and counsel insist that there is absolutely no evidence that importunity was used. Although there was no direct evidence that the testator yielded to importunity or that he had been importuned, there was, in our opinion, sufficient evidence to warrant the giving of this instruction.

It is also urged that the court erred in stating to the jury, in the same instruction, that "in considering whether the testator's free volition has been overborne or controlled, the jury must consider his age, his physical and mental condition, and all the circumstances surrounding the testator." We find nothing improper in this language, nor do we think undue prominence, as suggested by counsel, was given to the age and mental condition of the testator. It was clearly proper, in determining the question, for the jury to take into consideration the age and the physical and mental condition of the deceased, at the time he signed the document, and the direction to the jury was not erroneous.

The following was given as a part of instruction No. 13: "If a party makes a will contrary to natural justice, this, with other facts, may be considered, but the mere fact that a will is not exactly according to what our own conception of justice would be, is not of itself sufficient to invalidate a will."

We do not regard this portion of the instruction as improper. It is true, that one may dispose of his property as he pleases, and that one may indulge his prejudice against his relations and in favor of strangers, and that if he does so, it is no objection to his will; and that no one, except a husband or wife, can enforce a natural right to a share in a testator's

bounty; but a jury, in determining whether a decedent was capable of disposing of his property by will, has a right to consider that, in disposing of it, he has passed over the natural objects of his bounty, and has bestowed his property upon others. We think the jury was not misled by this instruction.

The other assignments of error relate to the sufficiency of the evidence to warrant the court in submitting to the jury the questions of the undue influence and incapacity of the decedent. This court has approved the following as a correct announcement of the law governing will contests, when the issue is whether the will was or was not produced by undue influence: "A charge of undue influence is substantially that of fraud, and it can seldom be shown by direct and positive evidence. While it is true that it must be proved, and not presumed, yet it can be, and most generally is, proven by evidence of facts and circumstances which, as to themselves, may admit of little dispute, but which are calculated to establish it, and from which it may reasonably and naturally be inferred. It was also said that a court 'should be liberal in admitting evidence of all circumstances, even though slight, which may tend, in conjunction with other circumstances, to throw light upon the relations of the parties and upon the disputed questions of undue influence.' "—*In re Shell's Estate*, 28 Colo. 167.

With this rule to guide us, we have no hesitancy in saying that there was sufficient evidence to warrant the court in submitting the question to the jury.

The circumstances attending the charges that undue influence was exerted in the execution of the document offered for probate as the last will of George Cleve, and that he was not possessed of sufficient capacity to execute a valid will, are so nearly

allied in this case, that they will be considered together. The fact that Cleve left his comfortable home in Larimer county and came to Denver and became associated with the mission which had for its object the rescuing of the poor and outcast of Denver, would not, of course, be regarded as evidence of a want of testamentary capacity. There are too many instances recorded where such things have been done, and there are too many noble men and women engaged in such worthy work to warrant any such inference to be drawn from his conduct; nor should the fact that after becoming associated with this religious organization, he became its devotee and apparently consecrated his time and energy, his means, and his life, in fact, to the advancement of its objects, be regarded as proof of an unbalanced mind; nor ought the fact that this uneducated man became an exhorter at the mission, be regarded as more than the eccentricity of an egoist; nor should the fact that, being in comfortable circumstances, he lived without many of the comforts of life, cooking his own scanty meals at the mission house, and living there with the woman workers, be considered as more than a peculiarity; but these facts, when taken in connection with the testimony received, which we have carefully read, but which we do not deem it necessary to mention here, were sufficient to warrant the court in submitting the case to the jury and sufficient to warrant us in not disturbing the verdict.        *Affirmed.*

Mr. JUSTICE GABBERT and Mr. JUSTICE BAILEY concur.

Decided October 4, A. D. 1909; rehearing denied July 6, A. D. 1910.