# KNIGHTON v. MANNING et al.

No. 5301.   Decided June 13, 1934.   (33 P. [2d] 401.)

*Willard Hanson* and *E. R. Christensen,* both of Salt Lake City, for appellants.

*Larson & Larson,* of Manti, for respondent.

STRAUP, Chief Justice.

Augusta Matilda Larson, better known as "Tilda Larson," and Oscar B. Berglund, both unmarried, lived together in Sanpete county. substantially as husband and wife without either recognizing or holding the other out as such, from about December, 1919, until her death March 30, 1930. He died October 23, 1930. ·She died· intestate. He died testate. The administrator of the estate of Tilda Larson brought this action in four counts or causes of action against the executors of the estate of Berglund: The first, for board, lodging, and services alleged to have been furnished and rendered by the plaintiff's intestate to Berglund, amounting to over $4,900, for the period the parties lived together and

for which amount with interest judgment was demanded. The second, for an alleged conversion by Berglund after her death of $155 in money belonging to her. The third, for an alleged conversion by Berglund after the death of plaintiff's intestate of "certain household goods, furniture, cooking utensils, dresses, clothing and personal effects of the value of $150; an opal ring or moonstone of the value of $10; a diamond ring of the value of $500; 28 shares of the capital stock of the Gunnison Irrigation Company of the value of $560," chickens of the value of $15, and "ten head of cattle of the value of $400," all of which it was alleged to have been the property of Miss Larson at the time of her death and for which judgment was demanded in the sum of $1,636. The fourth count or cause of action was for the cancellation of a warranty deed which it was alleged Berglund through fraud and false promises (of which there was neither evidence nor findings) induced Miss Larson in December, 1922, to sign, purporting to convey to him the real estate and home consisting of three lots and a small dwelling and other improvements, occupied and possessed by Miss Larson in December, 1919, when the parties began to live with each other and which was occupied by them until her death and thereafter by Berglund until his death, which deed, as alleged, at no time was delivered by her to him and was given without consideration; that such property was of the value of $1,700; and that Berglund caused the deed to be recorded April 3, 1930, three days after the death of Miss Larson. Judgment was demanded for the cancellation of the deed and for restitution of the premises.

By the answer of the defendants, the averments of the complaint as to the legal representatives, the living together by the parties, the execution and recordation of the deed, and other formal matters were admitted. The defendants, however, denied the material allegations as to board, lodging, and services furnished and rendered by Miss Larson to Berglund, her ownership of the alleged personal property at the time of her death, and the conversion of any of it by

Berglund or the defendants; denied that the deed was obtained by fraud or otherwise wrongfully; denied the nondelivery of it, or that it was given without consideration; and denied that Tilda Larson was the owner of the property described in the deed at the time of her death.

The case was tried to the court without a jury. Upon the evidence adduced by both parties the court as to the first and second counts or causes of action found the issues in favor of the defendants and dismissed both of such causes of action. As to the third and fourth counts or causes of action, the court made findings in favor of the plaintiff and adjudged and decreed that "the plaintiff have and recover from the defendants all of the property" mentioned in the third cause of action, except as to the cattle, the court decreeing that the defendants return to the plaintiff "four cows and one calf" instead of ten head of cattle as alleged in the third cause of action. As to the fourth cause the court found a nondelivery of the deed and that it was given without consideration and decreed the deed cancelled and plaintiff let in possession of the premises.

The defendants appeal from the judgment rendered against them on the third and four causes of action. They assail the findings as not supported by the evidence, and in other particulars as being against the great and manifest weight of the evidence; that the findings and decree in material particulars, especially as to the third cause of action, are not responsive to the theory stated in the complaint and on which the case was tried, and in other particulars that the findings and decree are so indefinite and uncertain as to render the decree of no binding effect and as being incapable of enforcement.

Both Berglund and Miss Larson were rather advanced in years, the exact age of neither being disclosed by the record. The real estate in question, referred to as the home of Miss Larson, was owned by Anna Larson, the mother of Tilda Larson, prior to her conveyance. The mother died in 1918. At the time of her death and for some time prior thereto

she and Tilda occupied the premises as their home. They together kept some cows and chickens on the premises and themselves took care of them. Before the mother died, she in January, 1918, conveyed the premises to Tilda, and to three other daughters and a son, John E. Larson, all married, except Tilda who never was married. Such deed was recorded in January, 1920. After the death of the mother, Tilda, until she began to live with Berglund, lived alone on the premises and kept some cows and chickens. Berglund was a banker, president of the Gunnison Valley Bank, interested in investment companies and other industrial corporations, owned a farm and other lands, and was the owner of some sheep and cattle. He was reputed to be of considerable means. What property he owned or the value thereof at the time of his death is not shown. He and Tilda were acquainted with each other for many years. They associated together and visited each other for some time before the mother of Tilda died. In December, 1919, he began to live with Tilda on the premises occupied by and deeded by the mother to Tilda and to her three married sisters and her married brother. Berglund and Tilda lived together and alone in the same house in all respects as husband and wife, except that neither as to their friends or acquaintances nor as to the public recognized each other as husband and wife, nor did they hold themselves out as such. They so lived together for a period of over ten years and until the death of Tilda in March, 1930. When Berglund began to live with her, Tilda was possessed of some household goods, furniture, cooking utensils, and other personal effects. The character, quantity, quality, or value of such property was not alleged nor found. She also was possessed of some cows and chickens, but again neither the number of such cows or chickens or the character or value thereof was alleged nor found. Evidence was given to show that several years prior to her death she was the owner of some three cows and some chickens which were claimed by her, and that Berglund at different times stated the cows and chickens belonged to

her. It is alleged that at the time of her death, she was the owner and in possession of the property heretofore stated and the value thereof as alleged in the third cause of action. But no evidence was given of such or any value. While the court found she, at the time of her death, was the owner of such property (except ten head of cattle), yet no finding was made as to the character, quantity, or value of any such property, except the chickens, and by the decree the court ordered all of such property returned to plaintiff by the defendants, without designating or describing the household goods or furniture either as to quantity, quality, or value, or otherwise by which such property could be identified, nor were the four cows and the calf ordered to be returned in any manner described or designated, other than as "four head of cows and a calf," nor was the value of the rings or of the water stock found, also ordered to be returned to the plaintiff by the defendants. While it was alleged and found by the court that the property mentioned in the third cause of action was, after the death of Tilda Larson, possessed and detained by Berglund until his death, and thereafter all of such property came into the hands of the defendants as executors of the estate of Berglund, yet there is no evidence of any kind to show that any of such property came into the hands of the executors or was taken over by them as property or assets of the estate of Berglund or otherwise, or that Berglund was in possession of any of such property at the time of his death. That is especially true as to the household goods and furniture, dresses and personal effects of Tilda Larson, the opal and diamond rings, the chickens, and the four cows and calf, ordered to be delivered to the plaintiff by the executors. No evidence was given by the plaintiff to characterize any of the property alleged in the third cause of action, other than or different from that stated in the complaint, except the water stock, and no evidence whatever as to the value of any of such property.

As is seen, the third cause of action was predicated on the theory of a conversion whereby the plaintiff sought, not a

return of the property, but the value thereof alleged to be in the aggregate of $1,636. But as no evidence of any kind was given as to such value (except the chickens), no such judgment could be rendered, whereupon the court proceeded to render a judgment requiring all of the personal property mentioned in the third cause of action to be returned, without any evidence to show that any of it was taken over or possessed by the executors as property or assets of the estate of Berglund, or as otherwise coming into their hands or possessed by them. The plaintiff, however, asserts that under the Code and under his prayer for general relief, the court was authorized to grant any relief consistent with the case made and embraced within the issues. Let that be conceded. But the plaintiff was not entitled to judgment on the theory of a conversion because no evidence was given as to the value of any of the property. He was not entitled to recover for the return of the property on the theory of replevin or claim and delivery, for no evidence was given to show that any of the property at any time was taken over by the executors or came into their possession.

Further, the language of the decree that Tilda Larson at the time of her death was the owner of "certain household goods, furniture, cooking utensils, etc., four head of cows and a calf, one yellow gold band ring with a diamond set in it," and no other or further description or characterization to identify such property required to be returned, is so uncertain and indefinite as to render the decree in such particular incapable of enforcement. Surely an officer clothed with proper process to enforce the decree would not be justified in taking from the defendants any four cows and a calf found in their possession, or any or all household goods or furniture or cooking utensils or any diamond ring found in their possession, regardless of value or other description. Should the officer or executors for a more complete description resort to the pleadings or findings, they would find no other or different or better description than contained in the decree.

Now as to the fourth cause of action, the cancellation of the deed from Tilda to Berglund: When Berglund in 1919 began to live with Miss Larson, he opened a bank account in her name at the bank of which he was the president and each year at different times and until her death, a period of over ten years, deposited moneys of his own in such account amounting in the aggregate to over $11,000. He with his own moneys made all of the deposits. She made none. She, and she alone, drew on such account as she desired for her own use and benefit. In 1919 Berglund deposited in such account $1,521; 1920, $2,650; 1922, $2,189; 1923, $1,019; 1927, $1,060; and in each of the other years from 1919 to and including 1929, amounts from over $240 to $640. Miss Larson drew on such account various amounts each month. The checks generally were small, running from a few dollars to something less than $100, except a few for more than $200, and four checks of $550 each drawn at about the same time in August, 1920. It will be remembered that in January, 1918, the mother of Tilda deeded the place to Tilda and to Tilda's three married sisters and her married brother. In August, 1920, Tilda purchased the interests of her three sisters and of her brother, paying to each $550 by checks drawn on her account. They in turn conveyed their interests to Tilda. Prio to issuing such checks, and in July and August of the same year, Berglund by two checks of $1,100 each deposited to Tilda's account $2,200, and in the same year deposited other amounts, in the aggregate $2,650. That the moneys with which Tilda paid her sisters and brother for their interests were moneys which Berglund had deposited to Tilda's account is conceded. The deed made by Tilda to Berglund conveying the place to him was made in December, 1922, at a time just before he and Tilda made a visit or trip to California. The deed was properly witnessed and acknowledged before a notary public and purported to convey the property fully described to Berglund. Thereafter he paid all of the taxes and assessments on the property, made improvements and additions to the house by

installing a bathroom, pantry and closet, flooring a portion of the rooms of the house, tore down an old rock house, built a barn, and made other improvements about the place. All such improvements were made under his orders and directions and all material and labor paid for by him. From then he began to live with Tilda until her death, he paid all of the living and household expenses, including coal, electric lights, and water rates or assessments, etc., and exercised dominion and control over the place as though owned and possessed by him. The deed was recorded at the request of Berglund April 3, 1930, three days after the death of Miss Larson. When Berglund died, the deed, indisputably signed by Miss Larson, properly witnessed and acknowledged before a notary public, was found among his papers at the bank. In such case and in the absence of evidence to the contrary, a presumption of fact or inference arose of the execution and delivery of the deed at about the date stated in the deed, and the burden cast on those claiming nondelivery of it to show such fact, not by mere doubtful inferences or suspicious circumstances, but by clear and satisfactory evidence. *Chamberlain* v. *Larsen* (Utah) 29 P. (2d) 355; 18 C. J. 441, § 548;; 1 Jones, Comm. on Evid. (2d Ed.) 319; *Fish* v. *Poorman*, 85 Kan. 237, 116 P. 898; *Jones* v. *Betz*, 203 Iowa 767, 210 N. W. 609, 213 N. W. 282; *Tunison* v. *Chamblin*, 88 Ill. 378; *Ward* v. *Conklin*, 232 Ill. 553, 83 N. E. 1058; *Malaney* v. *Cameron*, 98 Kan. 620, 159 P. 19.

That is especially true where there are surrounding circumstances consistent with the presumption (1 Jones, supra, § 192); and where rights of third parties intervened, the proof of nondelivery should be clear and positive (18 C. J. 438, § 541). The plaintiff assuming such burden of proof undertook to show facts and circumstances which he in effect claimed displaced whatever presumption may have arisen by reason of the possession and recordation of the deed by Berglund, and which as the plaintiff contends justified the finding of the trial court of nondelivery of the deed by the grantor Miss Larson. In support of such contention

it was shown by him that in June, 1929, more than six years after the deed from Miss Larson to Berglund, she for a consideration of $750 by warranty deed conveyed to Nolan Edwards a parcel (about one-half acre) of one of the lots described in the Berglund deed. Such deed was witnessed by Berglund, and was acknowledged before a notary public, but was not recorded. The full consideration thereof was paid by Edwards to Miss Larson. After Berglund put his deed on record, and about April 24, 1930, he executed a warranty deed to Edwards for the same property conveyed by the deed of Miss Larson to Edwards, had it recorded, and delivered it to Edwards; Berglund at the time stating he executed and recorded such deed to straighten out the record title in Edwards and to protect him, and requested Edwards to return to him the unrecorded deed of Miss Larson. The Berglund deed was accepted by Edwards, who agreed, or at least did not refuse, to return the deed of Miss Larson, but neglected to do so before Berglund's death.

The plaintiff further called a witness, Hermansen, an intimate friend of Berglund, who in substance testified that a year or more before the death of Miss Larson he visited Berglund while ill at his house, at which time Berglund, in the presence of Miss Larson, stated that if he "passed away first" he had deeded his property and made assignments of his stocks and bonds, and that Miss Larson had done likewise; that on such or on another occasion, some discussion was had also as "to the ownership of the home," Berglund stating it belonged to him, and Miss Larson that it belonged to her, she stating that Berglund had nothing to do with it; that Berglund stated he had paid the purchase price of the four heirs ($2,200), built a bathroom, pantry, etc., and had put more money in the place than they ever could get out of it; that such statements were not denied by Miss Larson, but in response thereto she stated that what Berglund had done in such respect was "his own free will"; and that he was getting just as much good out of the place as she was.

The witness further testified that the morning after Miss

Larson's death (she having died on Sunday about 1 o'clock p. m.) he at the request of Berglund called at his house, and that they together went to the cemetary and directed the sexton where to dig the grave, selected a casket, and attended to other matters relating to the burial, and then went to the Gunnison Valley Bank. There Berglund got his safety deposit box and proceeded to take out papers and segregated them, stating he had deeded some of his property and made assignments of certain papers to Miss Larson, and that she had deeded her property to him and had made assignments of her stocks and bonds, and that "whichever one died first was to take what was left"; that Berglund segregated such papers and placed one bunch in a pouch together with a signed check stating that he would have such papers recorded; that the witness did not see the papers sufficiently to indentify them except a life insurance policy which Berglund stated he would have changed; that he took out some papers which he said were assignments and a deed which he said he was going to have recorded; that he took out several deeds, had the deeds there in his safety deposit box, sorted them out; that the papers he had made to Tilda he stated he would burn and those she had made to him he would have recorded; that he seemed to have both groups of papers in his box and got them out of his safety deposit box in the bank.

The plaintiff called another witness, Mrs. Larson, the wife of John E. Larson, the brother of Tilda Larson. Her competency to testify by reason of the statute (R. S. Utah 1933, 104-49-2) was not raised and hence her competency to testify as a witness is not before us; and whatever ▪ disqualification, if any, was possessed by her was waived because no objection was made as to her competency. She, in substance, testified that about a week before the death of Miss Larson the witness and Tilda were looking in Tilda's trunk for family records which, the witness stated, Tilda had turned over to J. E. Larson, her brother; that they were genealogical records, their ancestry back in

Sweden. The witness then was asked by plaintiff's counsel: "Q. Now did you observe any deed or water certificates in that trunk that day?" To that an objection was made by counsel for the defendants as leading and suggestive. The objection was overruled and the witness answered, "Yes, sir." Counsel for the defendants then asked the witness:

"Q. Did you read the papers yourself or was it your sister told you that? A. I read them.

"Q. At that time, at the time you were looking? A. I read the papers when we were looking.

"Q. You read a paper? A. I read some papers."

Counsel for plaintiff thereupon asked the witness whether from observations made by her that day she could remember what she saw in the trunk. The witness then, in substance, stated that Tilda had a bunch of papers and when she went to look for the records she pulled the papers apart, that they were folded in a rubber band and as she laid the papers down the witness was looking at the water certificates, insurance papers, and different things, and that one was a deed made out by Tilda to Berglund, whereupon the witness stated, "Good land—"; that "such deed covered the home"; and that there were two water certificates in the trunk, but the witness did not know how many shares they represented, but that they were shares of the Gunnison Irrigation Company.

The witness further testified that she again looked in the trunk three or four hours after the death of Tilda, and on such occasion saw the same deed in the trunk and the water certificates she had seen in the trunk on the previous occasion; that on the second occasion, Berglund and a sister of Miss Larson, a Mrs. Childs, were present; that Mrs. Childs for about a week before the death of Tilda had been at the house taking care of her; that three or four hours after the death, Berglund asked Mrs. Childs if she knew anything about "a key to the bank box," to which Mrs. Childs replied that she had not seen any; that thereupon Berglund asked

for Tilda's purse, stating the key might be in her purse. The purse was found in a buffet drawer but the key was not found therein; that they then looked in the trunk; that Berglund and Mrs. Childs pulled it out of the closet and opened it and, looking for the key, found it in an envelope in a till of the trunk. The witness then was asked by counsel for plaintiff: "Did you know that the deed covering Tilda's home was in the trunk that afternoon?" That was objected to, the objection overruled, to which the witness answered: "Yes, it was there, and the two water certificates." The witness further testified that the deed was taken from or pulled out of a bunch of folded papers with a rubber band around them, and was unfolded by Berglund, or Mrs. Childs, and "while they were looking at it Mrs. Childs asked Berglund 'if Tilda left the home to him,' she having seen the deed that had been made by Tilda to Berglund, it made Mrs. Childs sore, and Berglund in a surly manner replied, 'Why not?'; that Mrs. Childs then asked Berglund what the certificates were and why they were in the trunk, that Mrs. Childs didn't know that she (Tilda) still had those deeds, but Berglund said nothing, he would not answer, he just took them and that was all there was to it. He was surly and took everything out of her purse when he got it, emptied everything out of it." The witness, however, did not testify that Berglund took anything that was in the purse.

Upon cross-examination the witness further testified that on the first occasion Berglund came into the house while the witness and Tilda were looking in the trunk and watched what they were doing; that the witness "had looked at the deed when he came. I didn't say anything to him about the deed. I never mentioned a thing to him about it. I knew the deed purported to convey the old home to Berglund and I read it, and Berglund came in immediately thereafter. It was the front I read—it said it was from Tilda Larson to O. B. Berglund," that the witness could not remember anything more. She was asked by counsel for the defendants:

"I want to know what it was that you saw on that (the deed)? A. It was a description of her home.

"Q. Did you read it? A. No, I just read the front."

She further answered that she had not read the inside, but what she read was on the front or on the back of the deed as it was folded, and what she read was on the outside of the deed.

"Q. All you saw then was contained on the outside of the deed as you have illustrated here on this part where the record would be. That is right, isn't it? A. Yes.

"Q. Was it in handwriting or typewriting? A. It was in handwriting.

"Q. Whose handwriting? A. I don't know, I never asked.

"Q. That that you saw on the outside of the deed was in handwriting, was it? A. Yes sir. * * * It was the part that was just filled in, on the back whichever that was, in handwriting filled in."

She further testified that upon the first occasion the deed was not unfolded either by herself or by Tilda, and "all that I saw was written on the back of it, except as to the printed portion of it where it had been filled in. That was asmuch as I saw of the deed. On the following Sunday (the second occasion) Mrs. Childs opened it. I didn't read it. I was over by the table and they (Mrs. Childs and Berglund) were looking at them. * * * It seemed like they opened it." But the witness did not see the inside of it; that what she saw on the outside was "Tilda Larson to O. B. Berglund." She further answered the description of the deed was in typewriting, then stated it was in handwriting, that "first was some typewriting on that deed," the deed from Tilda to Berglund. She further answered that she didn't know whether it was in typewriting or not, but that it was made out from Tilda Larson to O. B. Berglund. She further stated that the deed was taken from a bundle of papers folded up about half an inch thick; that she didn't know what other papers were in the bundle.

As to the water certificates the witness identified them only by color, stating that they were of the same color and

appeared to be brown. One of the certificates on the outside was green, on the inside brown; the other on the outside white, and on the inside light brown. She testified she did not know the number of shares of the certificates, and did not know that they were shares of the Gunnison Irrigation Company, except from appearance, stating that she and her husband had water shares or that she had seen water shares of the same company. The witness further testified that the deed and the water shares found in the trunk were taken by Berglund on the second occasion, three or four hours after the death of Miss Larson.

The deed from Miss Larson to Berglund was put in evidence by the defendants. The deed was filled out on a statutory blank form of warranty deed. On the outside printed in large letters are the words, "Warranty Deed," and other printed words, such as "recorded at the request of" and blanks to be filled in as to the date of recordation and the book and page where recorded. The body of the deed is in the handwriting of Berglund. There is no typewriting either on the inside or outside of the deed. The acknowledgment, except the printed matter, is in the handwriting of the notary public. The deed as put in evidence on the outside had the words in handwriting, "Tilda Larson to O. B. Berglund," the date filled in in writing, "Dec. 9th, 1922," the printed words, "Recorded at the request of," filled in in writing, "O. B. Berglund, April 3, 1930," and the time, book, and page where recorded filled in in handwriting and signed by the recorder.

Evidence was given on behalf of the defendants that when the deed was presented for record there wasn't anything except the printed words on the outside of the deed; that the words, "Tilda Larson (to) O. B. Berglund," and all other writing on the outside of the deed, were written by and were in the handwriting of the deputy recorder; and that all of the writing on the outside of the deed was put there by him or the recorder when the deed was presented for record and was recorded. That was not disputed, nor attempted

to be disputed. So when the witness Mrs. Larson testified that she on the occasions referred to saw on the outside of the deed the words, either in handwriting or typewriting, "Tilda Larson to O. B. Berglund," she evidently was mistaken, for, as stated, when the deed was presented for recordation there wasn't anything either in handwriting or typewriting anywhere on the outside of the deed, merely the printed matter to be filed in.

Further evidence was given by the defendants that Berglund, Mrs. Childs, Mrs. Larson, and others were at the bedside of Miss Larson at the time of her death; that after her death, Berglund went into the kitchen and seemed to be in grief and in tears; that Mrs. Childs, Mrs. Larson, and other women were cleaning up rooms of the house, some of them washing the body of Miss Larson, and were engaged in such work until the undertaker from Richfield arrived and then assisted him in embalming the body. A number of witnesses testified that Berglund was in the kitchen and about the sitting room all afternoon, that he had not left the house, some of them testifying he still remained when they left about dark, one witness stating he was still at the house as late as 11 o'clock p. m.; that a number of his friends called that afternoon expressing sympathy, coming and going all afternoon. Witnesses who were there at the time of the death of Miss Larson and who remained there all afternoon and until late at night, or at least until dark, testified that at no time did they see a trunk taken out of the closet or saw any one open a trunk or saw any trunk about the house. Some of them testified that after the death of Miss Larson, Berglund inquired from Mrs. Childs if she had seen a letter received recently by Miss Larson, stating he desired the address of the person sending the letter to notify such person of the death; that they looked in the kitchen, the living room, and the bedroom and found the letter. Such witnesses on cross-examination were asked if the trunk might not have been pulled out of the closet as testified to by Mrs. Larson and opened and something taken out of it without the witnesses

seeing it. They answered that it was possible that such might have occurred, but that they were about there all the time in and out of the rooms, some of them in the bathroom where the closet was, and in and out of the kitchen, bedroom, and sitting room cleaning up and assisting in taking care of the corpse, and that they did not see nor know of any such occurrence, but that it could have occurred without their seeing it.

Now as to the water certificates: One certificate for 8 shares was issued to Miss Larson in October, 1920. That was indorsed by Miss Larson in December, 1922, to Berglund, and the indorsement witnessed by a third person. The other certificate of 20 shares was issued to her in January, 1923, and indorsed by her to Berglund and witnessed. The date of that indorsement is not noted on the indorsement. The signatures of Miss Larson on such indorsements are admitted. The secretary of the Gunnison Irrigation Company testified that both of such certificates properly indorsed and presented were on April 4, 1930, canceled and a new certificate issued in lieu thereof to Berglund for 28 shares of stock. The only finding made by the court with respect to the water certificates was that Tilda Larson at the time of her death was the owner of "twenty-eight shares of the capital stock of the Gunnison Irrigation Company," and a general finding that all of the property described in the third cause of action was after the death of Tilda Larson detained by Berglund and wrongfully converted to his own use. But no finding was made as to the delivery or nondelivery of the certificates of the water stock issued to Tilda nor any finding otherwise with respect thereto, except as to the transfer of such certificates. The decree in such particular was merely that the plaintiff have and recover from the defendants the property described in the third cause of action, and the transfer of the certificates on the books of the irrigation company and the certificate issued to Berglund in lieu thereof declared null and void and canceled. But no finding is made that the certificates of stock

were not properly indorsed by Tilda Larson to Berglund, nor any finding as to whether they were or were not delivered by Miss Larson to Berglund, nor is there any finding that the certificates of stock were or were not found in the trunk or otherwise in the possession of Tilda at the time of her death. In other words, with respect to the water stock, the real dispute or controversy was as to whether such certificates of stock were or were not in the lifetime of Tilda delivered to Berglund; but no finding in such particular was made. Until a finding supported by sufficient evidence of nondelivery of such certificates of stock by Miss Larson is made, the signing and indorsing of the certificates by her to Berglund being admitted, the decree canceling the transfer to Berglund, and requiring the defendants to return to the plaintiff the certificates theretofore issued to Miss Larson, has no support.

The fourth cause of action is one in equity. The other causes as alleged are actions at law. However, counsel for both parties assert that the whole case was tried as one in equity. Notwithstanding such statement of counsel, we regard the fourth cause of action as in equity, and the third as an action at law. We refer to the matter only as bearing on the function and office of our review. In an action at law a finding of the trial court usually is approved if there is sufficient competent evidence to support it, though the evidence with respect thereto may be in conflict and the finding apparently against a preponderance or the greater weight of the evidence. In an equity case on an appeal on questions of both law and fact the rule is different. There, it is our duty to determine questions both of law and fact, giving due consideration to the better opportunity of the trial court in determining the credibility of witnesses and the weight to be given their testimony. If, when so considering a finding on a review of the record, we are of the opinion that it is supported by the greater weight of the evidence, it ordinarily will be approved; otherwise it will be disapproved by us. *Corey* v. *Roberts* (Utah) 25 P. (2d)

940; and cases referred to in *Sipherd* v. *Sipherd* (Utah) 27 P. (2d) 801; *Chamberlain* v. *Larsen*, supra.

As heretofore indicated, the plaintiff had the burden to show nondelivery of the deed from Miss Larson to Berglund by clear and satisfactory evidence. The question is: Did he sustain such burden? That Miss Larson about six years after she made the deed to Berglund deeded a ■ parcel of land to Edwards, Berglund signing as a witness, is some evidence tending to show that she and not Berglund then was the owner of the property. Still such circumstance may not be inconsistent with a prior delivery of the deed from Tilda to Berglund and which was not recorded, for there may have been some understanding between the parties that such deed was not to be recorded until after the death of Tilda, and thus as the record title stood in her name, the deed was made by her to Edwards regardless of the real owner of the property.

Then there is the testimony of Hermansen, an intimate friend of Berglund, that each party a year or more before the death of Tilda claimed to be the owner of the property. More significant, however, is the further testimony of Hermansen that Berglund, on that or on another occasion in the presence of Tilda, stated that he had deeded and made assignments of property and that Tilda had done likewise of her property; that the day after the death of Tilda when Berglund took "two groups" of papers out of his safety deposit box at the bank and segregated them and again declaring he "had deeded some of his property, he didn't say what amount, and made assignments of certain papers to Miss Larson and that she had deeded her property to him and had made an assignment of her stocks and bonds and whichever died first was to take what was left," and Berglund further stating that the papers made out by him he would destroy and those she had made he would have recorded, which rather implies no delivery of the instruments or documents inter vivos had been made, and that the docu-

ments were subject to his or her control and revocation. There was no delivery of any kind of the documents or assignments executed by Berglund, all of which indisputably were in his possession the day after the death of Miss Larson and no delivery of any kind intended to be made during his lifetime and all subject to his control and revocation. From his declarations, as testified to by Hermansen, it reasonably is inferable that no other or different delivery was made by Miss Larson of the documents and assignments made by her. In other words, by such declarations had Berglund died before Miss Larson, the property conveyed and assigned by her was not intended to descend to his heirs or to his estate, but that she was at liberty or had the right to revoke and destroy all such documents and assignments, just as Berglund, surviving her, claimed the right to revoke and destroy all documents and papers made by him to her.

Further as to this: There is the testimony of Mrs. Larson, the wife of J. E. Larson, the brother of Tilda Larson. Should her testimony as given on direct examination be accepted, it would quite clearly appear that Tilda Larson had not parted with or had made any kind of delivery of the deed from her to Berglund. But her testimony on direct examination was materially modified by her cross-examination, and in some particulars rendered of doubtful value. The testimony of a witness on direct examination is no stronger than as modified, explained, or left on cross-examination, or as otherwise rebuilt on redirect examination. Here there was no rebuilding or further explanation on redirect. Perhaps the most effect that may be given her testimony considered all together is that she about a week before the death of Tilda Larson and three or four hours after her death saw in Tilda's trunk, among other papers with a rubber band around them, some kind of a warranty deed and shares of water stock which were withdrawn from such bunch of papers and taken by Berglund. The most significant part of her testimony tending to indentify the deed is that when the deed, three or four hours after

the death of Tilda, was taken from the trunk and unfolded either by Mrs. Childs or by Berglund and while they were looking at it, Mrs. Childs asked him, "Did Tilda leave this home to you?" and his reply, "Why not?"

The witness, of course, had an interest in the outcome of the litigation, which is to be considered in determining her credibility and the weight to be given her testimony. We do not say it was such a direct interest as, by the statute referred to, rendered her an incompetent witness, for as heretofore observed, no such question is before us, and whatever disqualification, if any, possessed by her was waived. Still, the fact that she was the wife of J. E. Larson, who was "directly interested in the event" of the action, could properly be considered as bearing on her credibility and the weight to be given her testimony. As to that the trial court was in a better position than we to determine the effect of such credibility and the weight to be given her testimony, especially since in some particulars it was in conflict. The trial court evidently believed her, to the extent at least that the deed so found in the trunk and in possession of Miss Larson at the time of her death, and thereafter taken by Berglund, was the deed in question, and in connection with other facts and circumstances, thus found no delivery of the deed in the lifetime of Miss Larson. When in a case of a presumption of a delivery of a deed or other instrument and the burden cast on him who claims nondelivery to show such fact by clear and satisfactory proof, the quantum and character of evidence, except in criminal cases, is not necessarily required to be such as to produce a moral certainty or conviction to an unbiased mind beyond a reasonable doubt. It is that degree and quantum of competent and credible evidence which fully answers all requirements of what is needed and sufficient to satisfy an unbiased mind and set it at rest free from uncertainty as to the existence or nonexistence of a fact. The proposition is well put by the Iowa court in the case of *Good Milking Mach. Co.* v. *Galloway*, 168 Iowa 550, 150 N. W. 710, 712, that:

"When the evidence is such that the mind readily reaches a satisfactory conclusion as to the existence or nonexistence of a fact in dispute, then the evidence is, of necessity, clear and satisfactory."

Thus, on the whole record, we are not prepared to say that the finding of the trial court of nondelivery of the deed in question during the lifetime of Tilda Larson is against a fair preponderance of the evidence, and hence the finding is approved. The judgment as to the fourth cause of action is therefore affirmed.

The third cause of action, though tried to the court, we regard as an action at law. In such case we may not as in equity review the record and ourselves make or direct findings. As heretofore pointed out, the third cause of action proceeded on the theory of a conversion of all of the property therein described and for a money judgment for the value thereof. No value of any of such property was testified to nor found by the court, except as to the chickens. The court rendered a judgment as in replevin, requiring the return of all such property, without an alternative for the value thereof in case return could not be had, and without any evidence to show that any such property was possessed or detained by Berglund at the time of his death, or that any of such property was taken over by or came into the possession of the executors, except perhaps the certificates of water stock but no finding made as to a nondelivery thereof. And further, as heretofore indicated, the decree as to the third cause of action is so uncertain as to be incapable of compliance or execution. Thus, the judgment as to that cause of action in its entirety is reversed, and the case as to such cause remanded for a new trial. The value of the property alleged, but not proven, in the third cause of action being $1,636, the value of the property alleged, but not proven, as to the fourth cause of action $1,700, and since the judgment in the one is reversed and in the other affirmed, neither party is awarded costs on appeal against the other. Such is the order.

ELIAS HANSEN, FOLLAND, EPHRAIM HANSON, and MOFFATT, JJ., concur.