No. 15,237.

Estate of Koch.

Koch *v.* Garnier et al.

(136 P. [2d] 673)

Decided April 5, 1943.

Mr. SPERRY S. PACKARD, Mr. WILLIAM L. LLOYD, for plaintiff in error.

Mr. E. H. STINEMEYER, for defendants in error.

*En Banc.*

MR. JUSTICE JACKSON delivered the opinion of the court.

PLAINTIFF in error was the proponent in the county court of Custer County of a will alleged to have been executed by his father, Conrad Koch. Caveat was filed by the six sisters of proponent, all daughters of Conrad. Proponent, Charles, who was the only son, duly answered. The county judge's decision was against proponent. On appeal to the district court of Custer County, the verdict of the trial jury was that the will had been executed under undue influence and judgment was entered accordingly. For a review of this judgment, proponent brings the case here by writ of error, asking that the writ be made a supersedeas and operate accordingly. In compliance with his formal request, we have elected finally to determine the cause on the supersedeas application. We shall hereafter refer to the parties as proponent and caveators.

Motion for change of venue was filed by proponent with five supporting affidavits—two of the affiants being residents of Custer County, one a resident of Fremont County, in addition to the affidavit of proponent himself and one of his attorneys. The basis of the motion was that the inhabitants of the county would be prejudiced in favor of the caveators and against the proponent by virtue of the fact that most of the caveators lived in the county and their husbands and other relatives were well

known throughout the county. The caveators answered with eight counter affidavits of residents of Custer County, denying that a fair trial could not be had in Custer County. The trial court denied the motion for change of venue, and we see no ground upon which to predicate error here, or any indication that he abused his discretion in so ruling.

In addition to attacking the alleged will on the ground of its having been executed under the exercise of undue influence and duress at the hands of proponent, upon which ground caveators prevailed, caveators also based their attack on the ground that Conrad Koch was of unsound mind and that the execution of the document was procured by fraud and imposition. Proponent offered the alleged will in evidence, and the two attesting witnesses thereto then testified that the document had been duly executed by Conrad Koch as his will on November 10, 1938. The document, which was thereupon admitted in evidence, bequeathed two of the six daughters $100 each, to one of them $150, and to the other three $200 each. It then named the proponent, Charles Koch, as residuary legatee and devisee, and also named him as the sole executor without bond and with full power to sell.

After proponent had rested the caveators offered in evidence a deed from the father, Conrad, to his son Charles, said deed conveying all of the grantor's real estate; also a bill of sale running from Conrad to Charles conveying grantor's personal property. Both documents were dated January 3, 1940, a little over a month prior to the death of Conrad at the age of 85, which occurred on February 5, 1940. The deed was recorded on February 5, 1940. The trial court admitted both documents in evidence solely for the purpose of affording a comparison between the signatures of Conrad Koch appearing on those documents and his signature on the will. Objection was made to this evidence, and counsel for proponent now contend that this admission was error

because the genuineness of Conrad Koch's signature on the alleged will was not an issue under the caveat. The signature on the deed and bill of sale appeared to be different from that on the alleged will, executed approximately fourteen months earlier; however, the signature of A. T. Stewart appears as a witness on all three documents (he having prepared same as Conrad's lawyer) and Stewart testified on either direct or cross-examination to the genuineness of Conrad Koch's signature on all three documents. There was evidence that Conrad Koch had failed both physically and mentally in the few months prior to his death. Caveators offered in evidence a decree of court, taken by default, which set aside the foregoing deed and bill of sale. This was denied admission. The testimony of witness Stewart was to the effect that the alleged will, which was not filed in court until April 8, 1941, which apparently was after entry of the decree setting aside the above mentioned deed and bill of sale, had been held in his office or in the office of another lawyer during the fifteen-month interval between the date of Conrad Koch's death and the date of filing. Shortly after Conrad Koch's death an administrator was appointed for his estate, and this administrator testified that, in his judgment, the net value of the estate was about $12,000. Proponent had tried unsuccessfully to show that the assessed value of the property in the estate was $4,039.

By far the greater portion of the evidence of caveators consisted of the testimony of the six caveators themselves. The matters to which they testified covered a period of over twenty-one years, beginning with an incident twenty-one years prior to the death of Conrad when Charles, in a fit of anger at his father, picked up a neck yoke as if to strike him with it. This evidence was corroborated by a disinterested witness. Another incident to which Ora Ellen Bertorello, one of the caveators, testified was as follows: "* * * Papa pumped the water in the trough for the horses,— papa always done

the water pumping; and papa's horse happened to get there that time before Charlie's did, and Charlie picked up a club and knocked papa down — and then he ran through the yard and said 'Mama, I am leaving home; I killed papa'." .This same witness also testified: "Well, he used to run away from papa, and tell him to hurry up and eat his breakfast, when he would go threshing—one morning he went to the garage and came back and said 'If that damn old son-of-a-bitch ain't ready, we will go and leave him.' Mama said 'Don't you hurt papa, Charlie, don't you hurt papa'." On rebuttal this same witness testified that twenty-one years before her father's death Charles took her home from Canon City. Her father came out to the gate and, in reply to Charles' request to come back to the ranch, said: "Charlie, you can come back if you quit your tearing and damning and threatening to kill, but otherwise you can't come back; and I will give you one-fourth of the crop—what we bale and sell, not what we feed to the cattle."

In 1936 Conrad's wife died. Charlie, who at that time had been living on his mother's ranch, then moved with his wife and children to the home of his father in order that his wife could provide a home for his father. By that time Conrad was over eighty years old. Some of the caveators testified that when they came to see him he did not know them; that they were not encouraged to call; that when they wrote, their letters were not answered; that Charlie's wife explained this by saying that Conrad could not write and that she would have to write whatever had to be written.

Then on October 29, 1938, occurred the principal incident on which counsel for caveators rely: Conrad left the ranch without letting his son know and took the bus for Westcliffe. Upon arrival he went to the home of Lizzie Menzel, his daughter. He had several hundred dollars in his pocket with which he stated that he expected to pay debts of his wife's estate. When asked why he came up on the bus without letting his son's

family know, he stated that "he heard Charlie and his wife talking about some money and he got scared and ran off and come up." While two of his daughters and a son-in-law were in the house about noon, Charlie bolted in, without knocking, grabbed Conrad by the shoulder and said: "You are crazy—I am going to take you to Pueblo." "Who is the head troublemaker around here?" "There is a grave-yard up here, and we will damn soon fill it up." Conrad said nothing but turned white. After one of the caveators stepped up and quieted him, Charles left. Conrad went out after lunch and paid some bills. Charles came back and got Conrad and took him back home. When proponent's brother-in-law, August Menzel, asked Charles why he didn't "leave his father go and see the girls," proponent said: "Well, his lawyer told him not to leave him out of his possession."

A trip to Pueblo in proponent's car to consult his lawyer, Stewart, about the will must have occurred a few days after that incident, as the witness Stewart testified that Conrad had been in the office once previously to consult about his will before executing it on November 10, 1938. Proponent's testimony confirmed the foregoing testimony to the effect that his father left home and visited the Menzel home in Westcliffe on August 29, 1938, but he denies using the language which is credited to him by his sisters and brother-in-law in their testimony.

■ On the rule of evidence applicable in cases of undue influence, counsel for proponent refers to passages from *Clough v. Clough*, 10 Colo. App. 433, 51 Pac. 513, which Judge Campbell quotes with approval in *In re Shell's Estate*, 28 Colo. 167, 63 Pac. 413:

" 'A charge of undue influence is substantially that of fraud, and it can seldom be shown by direct and positive evidence. While it is true that it must be proved, and not presumed, yet it can be, and most generally is, proven by evidence of facts and circumstances which, as to themselves, may admit of little dispute, but which

are calculated to establish it, and from which it may reasonably and naturally be inferred.'

"And it was also said that a court 'should be liberal in admitting evidence of all circumstances, even though slight, which might tend, in conjunction with other circumstances, to throw light upon the relation of the parties, and upon the disputed question of undue influence.' "

The foregoing excerpt from *Clough v. Clough, supra,* has also been quoted with approval in *Blackman v. Edsall,* 17 Colo. App. 429, 68 Pac. 790, *Lehman v. Lindenmeyer,* 48 Colo. 305, 109 Pac. 956, as well as being referred to in subsequent opinions of this court as setting forth the liberal rule for the admission of evidence in cases involving the execution of documents under undue influence.

Counsel for proponent point out that our court, in *In re Shell's Estate, supra,* after quoting from *Clough v. Clough, supra,* as above set forth, nevertheless held that the trial court had rightly excluded testimony relating to events that had occurred some sixteen or seventeen years prior to the execution of the will, and then quote the following from that opinion: "* * * the testimony was clearly inadmissible because not only was there no offer to show by competent evidence *a continuance of any general influence, supposed to be established by this class of testimony, down to, or near, the time of the execution of the will, but there was no testimony whatever showing that any undue influence was exercised by proponent over the testator concerning the making of the will at or near the date of its execution, or at any other time.* Testimony like that rejected, in order to be admissible, or to have any weight or significance, must be connected with direct or circumstantial evidence tending to prove that undue influence existed and that it was exercised at or near the time the will was made. *Indeed, none of the proposed evidence tended to show that any influence was exercised at the time the will was*

*executed, and it was properly rejected.* Its admission could not be other than prejudicial to the proponent." (italics ours)

In that case, however, sole reliance was placed on evidence of events occurring sixteen or seventeen years prior to the execution of the will, whereas in the instant case there was evidence of incidents right up to within two weeks of the time of the signing of the document. The events of twenty-one years previous, when standing alone, furnish no ground for a verdict of undue influence. Coupled with events occurring in the more immediate present, they may give a background or furnish continuity or may give a flavor or explanation to the more immediate events that do have a bearing on the question of undue influence. One single incident of an overbearing nature may not be as convincing as several such acts over a period of time.

■ Counsel insist that the testimony of caveators is incompent under *section 2, chapter 177, '35 C.S.A.* which reads: "No party to any civil action, suit or proceeding, or person directly interested in the event thereof, shall be allowed to testify therein, of his own motion, or in his own behalf, by virtue of the foregoing section, when any adverse party sues or defends as the trustee or conservator of an idiot, lunatic or distracted person, or as the executor or administrator, heir, legatee or devisee of any deceased person, or as guardian or trustee of any such heir, legatee or devisee; unless when called as a witness by such adverse party so suing or defending, and also, except in the following cases, namely: * * * "

Then counsel quote portions of our opinions *In re Shell's Estate, supra,* and *In re Shapter's Estate,* 35 Colo. 578, 85 Pac. 688, and contend that the testimony of caveators was incompetent under *section 2, chapter 177, '35 C.S.A.* It should be pointed out that both of those cases were decided prior to an amendment to our so-called "dead man's statute" which was enacted during

the 1907 session of the legislature, and which adds a sixth exception to the general rule of exclusion of testimony laid down in section 2, as follows:

"Section 1. That section 2 of an act entitled 'An act relating to competency of witnesses in civil cases,' approved February 11, 1870, being section 4816, Chapter 132, Mills' Annotated Statutes, be and hereby is amended by adding thereto the following, to-wit:

"Sixth. In any such action, suit or proceeding, any adverse party or parties in interest may testify as to any conversation or admission, or as to all matters and things connected with the subject matter of said action, suit or proceeding, and which conversation and admission and matters and things aforesaid, occurred before the death and in the presence of such deceased person and also in the presence of any member of the family of such deceased person over the age of sixteen years, or in the presence of any heir, legatee or devisee of such deceased person over the age of sixteen years; provided, however, that such member of the family, heir, legatee or devisee as the case may be, is present at the hearing of said action, suit, or proceeding, or whose testimony is or may be procurable at such trial.

"Section 2. All acts and parts of acts, if any there be, necessarily in conflict herewith are hereby repealed." S.L. '07, p. 629, c. 251; '35 C.S.A., c. 177, §2, par. sixth.

In this case both proponent and caveators stand in the same relation under the statute: both are heirs, both are legatees, both are beneficiaries under the will, both have an interest in the outcome of the litigation. If the testimony of one is barred, the testimony of the other is barred, and counsel for proponent now contend that neither proponent's nor caveators' testimony is competent and should not be considered on appeal. The incidents detailed in their testimony, including that which took place in the home of August Menzel on October 29, 1938, shortly before the execution of the alleged will, seem to come within the provisions of the *sixth para-*

*graph of section 2, chapter 177, supra.* In other words, the incidents described in the testimony of the six caveators were incidents where, in addition to Conrad Koch, both the proponent and one or more of the caveators were present, all being over the age of sixteen and also being present in court.

■ It is not necessary, however, to go into detail in regard to each incident set forth in the testimony, as the record discloses that no objection was made to the testimony of the six caveators by counsel for the proponent on the ground that they were incompetent under the statute, and they were cross-examined by counsel on matters to which they had testified on direct examination.

In *Eder v. Methodist Ass'n,* 94 Colo. 173, 29 P. (2d) 631, we held that certain beneficiaries under the will were incompetent to testify in contested proceedings to have it admitted to probate *over the objection of heirs of the testator.* (italics ours). In that case objection to the testimony was made at the time it was offered. In *Lamborn v. Kirkpatrick,* 97 Colo. 421, 50 P. (2d) 542, which was a proceeding involving the probate of a will in which probate was denied, we held that a party who fails to object on trial to the admission of alleged objectionable evidence waives the objection, and it will not be considered on review. That objections to the admission of testimony of witnesses incompetent under a "dead man's statute" in other states can be waived; see: *Shields v. Ekman,* 67 Utah 474, 248 Pac. 122; *Knighton v. Manning,* 84 Utah 1, 33 P. (2d) 401; *Qualls v. Monroe County Bank,* 229 Ala. 315, 156 So. 846; *Deacon v. Bryans,* 212 Cal. 87, 298 Pac. 30; *Bates v. Zehnpfennig,* 220 Ia. 164, 262 N.W. 141; *Baker v. Brown,* 125 Me. 298, 133 Atl. 305.

We believe that the admission of the deed and bill of sale dated January 3, 1940, was proper as being responsive to the two other charges in the caveat, if not to that of undue influence.

Proponent's counsel specify error on the ground that the evidence was insufficient to justify the verdict and that the trial court should have granted their motion for a directed verdict in favor of proponent. After an examination of the whole record, which discloses conflicting testimony, we believe there was sufficient competent evidence from which a jury could properly arrive at a verdict of undue influence. Under such circumstances, the verdict should not be set aside, and the judgment is accordingly affirmed.