### BRANSON v. ROELOFSZ, ET AL.

(No. 2017; July 27, 1937; 70 Pac. (2d) 589)

102

For the plaintiff in error there was a brief and oral argument by *Fred W. Layman* of Casper, Wyoming.

For the defendants in error, there was a brief and oral argument by *M. L. Bishop, Jr.* of Casper.

BLUME, Chief Justice.

This is a case involving the contest of a will. There was a verdict and judgment setting aside the will, and the contestee has appealed. The will in question was executed on November 16, 1934, and in its form complied with the statutes. It was set aside on the ground that the testatrix was of unsound mind. She left surviving her only brothers and sisters and nephews and nieces. The will left these relatives $1.00 each, and aside from that and aside from certain books left to Wilbert Henry Campbell, and certain provisions for funeral expenses and a tombstone for her deceased husband David Davis, testatrix left her estate to a certain "Foundation" to be created for the benefit of the blind.

1. At the conclusion of the testimony, the contestee moved for a directed verdict. The motion was overruled. A motion for a new trial was filed on the ground that the evidence was insufficient to support the verdict. That too was overruled. Thereupon a motion was filed for a judgment notwithstanding the verdict. The court also overruled that. Error is assigned in these rulings of the court. They involve a review of the testimony and inasmuch as that will give a general view

of the facts of the case, we shall discuss them first, stating in detail, however, only the testimony in favor of the prevailing parties, the contestants, and only the salient facts thereof.

The decedent was born in August, 1873. Her father was confined in the Topeka State Hospital, an institution for the insane, and was allowed to go home at times. On one of these visits he bought some morphine and after returning to the hospital he committed suicide. He had delusions and melancholia. One of the brothers of the decedent, too, was confined during several periods, commencing with January, 1921, in the same institution. He was of the maniac type. He died in 1931 while on parole. The decedent during her young womanhood taught school. She came to Wyoming in the early part of this century and was married to one David Davis, who died about 1923, leaving all of his property to his widow, consisting of personal property of the value of $54,000 or more and of a ranch of several thousand acres on Bad Water Creek, to which a small acreage of land was added subsequently, and which, at the time of the death of her husband was, perhaps, of the value of about $20,000. Davis and his wife lived on the ranch. The decedent continued to live on the ranch until about 1927 or 1928, when she moved into a home which she apparently purchased at Casper, Wyoming. It seems that, after the death of her first husband, she married one Robinson. What became of their relationship is not definitely shown, but judging from incidental testimony it may be gathered that, perhaps, it ended in a divorce. Decedent died in April, 1935, leaving an estate of approximately $38,000-$43,000.

During the year 1924, decedent attempted to commit suicide with a revolver in a fit of despondency. She did not succeed, but lost her eye-balls and became blind.

In 1926, she learned the so-called Braille system—a system enabling the blind to read.

A number of incidents were shown by the testimony, commencing with 1923 and ending shortly previous to the time of the execution of the last will and testament in question, which were intended to show that decedent had delusions and was generally of unsound mind. In 1923, before she became blind, her husband, Davis, told her that one of the line fences would be fixed at the joint expense of themselves and Davis's brother. She immediately flew into a violent rage and temper. Her husband "tried his best to calm her down. The more he tried, the more violent she became. Her eyes bulged out, and her face became almost livid." A good deal of testimony was given in connection with such temperament. After decedent became blind, she was induced to visit her mother and other relatives in Kansas. Donald Roelofsz, her brother, testified: "A. One night, about midnight, the neighbors came and told me Jozie (the decedent) had a spell and attacked my mother. Q. Did you go to Jozie's place? A. Yes. Q. What did you find? A. Went and knocked on the door. Mother said 'Don, come in quick, Jozie had a spell; I am scared to death.' She rolled up her arm. I could see where it was black and blue where Jozie had took hold of her. Jozie was still in the other room in an uncontrolled mad spell. * * * Q. How long would the depressed spells last? A. Sometimes a day; sometimes two or three weeks. Q. Did you ever see her when she was angry? A. Several times, uncontrollably crazy. A. When angry, how would she act? A. There wasn't any reason to her madness—would just rave around—you wouldn't reason with her." So the witness Scherk testified that her angry spells would last 30 to 40 minutes and until he simply had to go away. She mistreated her sister's children; at one time picked up a child about five years of age and threw him around

with such force that she split his lip open on the edge of a table. Decedent later denied her act, asserted that the child's mother got some blood somewhere else and smeared it on the child's lips. At one time a man was shooting chickens about two hundred yards from decedent's ranch, on the county road. Decedent got a gun and was going to shoot the man, stating that he could not shoot chickens in her door yard. The gun was taken away from her. Not being able to get along with her brother, and telling him to get off the place, she intended to enforce the order by a gun. Witnesses found her in an angry mood on the 16th of November, when the will in question was executed.

Decedent was unable to get along with her help, both at the farm and at Casper. After she became blind, she had some of her relatives come to the farm to help her, but they were able to stay but a comparatively short time. She was inconsistent in her conduct. For instance, she asked her brother to ride out and bring in all the cattle. He worked about two days and brought in some cattle and put them in the pasture. The next morning when he started to get some more, she directed him not to bring in any more and to turn out those which he had gathered. She told him to count the cattle on the range, and then told him to quit counting. She asked him to work on an irrigation ditch and later changed her mind and directed him to get wood. She would be lavish and again very miserly. She gave Ed Keenan two thousand dollars, when, according to some testimony, she did not owe him anything. When the Pentons visited her at Casper she would at times serve them with food which had been cooked three or four days previously, potatoes and bread which would be mouldy. At other times the food would be fresh. While still on the ranch she cooked nothing for the help but oatmeal for a period of ten days and stated that "if it is good enough for me, it is good enough for

them." She kept a small child with her at Casper at one time. The child's health was delicate; it needed a proper diet. A neighbor suggested that decedent get some one for twenty-five cents a day to take care of the child, but decedent claimed that she could not afford it.

Decedent was of a suspicious nature. One Ed Keenan worked for her at the ranch; perhaps had been on the ranch while decedent's husband was still alive. She had an altercation with Keenan. She "just became agitated; her face flushed; she raised her voice; her tone was rapid; she called him names; accused him of doing her dirt; stealing from her, stealing her money; spending it foolishly." The witness Scherk, who had known decedent for many years, and who did a good deal of work for her nearly up to the time of her death stated that she was suspicious of everybody, not so much about harming her as of beating her out of something. Still, she had people come to her house in Casper from the underworld "talking about land and homesteads. Two are now in the penitentiary; one is dead; two in the penitentiary." Mrs. Moore, apparently a life-long friend of decedent, testified that decedent became more suspicious after she became blind; that witness did a good deal of writing for decedent; that at one time the latter became dissatisfied and nervous and commenced to swear, stated that she would write the bank that witness was incompetent; that she cried and roared; cried like I never saw her before; made a noise like an animal." The witness Wolf, who, too, had known the decedent for a long time, testified that she was suspicious of everybody and everything, particularly in the later years of her life; that in 1934 she became suspicious of her nephew, stated that she was putting up a lot of money for him; that he wasn't accomplishing anything; thought there was something wrong, and that he acted queerly. She disowned her

mother, stating that the latter was not her real mother, and hence also disowned her brothers and sisters; she claimed that her father brought her supposed mother in one day; that decedent asked "who is that woman you brought with you," and was told that she was her new mother, when in fact there was no truth in that, and decedent's father was married but once. Decedent was suspicious that someone would steal everything she had. While her brother and sister were living with her on the ranch in 1925, she would not take a drink of water without first feeling in the cup, and without holding the cup under the faucet, rinsing it; nor would she eat anything until someone else would take food off the dish. She made a will in favor of her sister Blanche and revoked it. She made a will in favor of her nephew Bracken, expecting in that way to pay him for some of the work which the nephew had done for her; she revoked that will by the will now under contest and the following incident, perhaps, had much to do with that. About September 1st, 1934, she had a contest concerning some ditch and wrote to Bracken to get her at Lysite, which was done. They went to Bracken's homestead, came back for the trial in connection with the ditch. Two evenings later, while still staying at Bracken's homestead, decedent "was worked up about this water trial and things;" decedent accused her nephew "of doing things which he shouldn't do; told him there was something wrong with his mind, stated that he acted queerly." The next morning, she told him to get the car, which he did; then told him not to touch it. After he told her that he would take her to Lysite, she stated that she "would sit there until God would send someone for her, or else die; she would not eat, stated that it would not be safe; she would not drink. She stayed in the car all day and all night. Her nephew then walked ten miles to the ranch of George Davis and called the sheriff, who came, but did not get

her to go, at least not at that time. The next day, she finally consented to leave. After that she accused the nephew of having stolen some papers, which was not true. No adequate cause for these incidents is found in the record.

The decedent would have a feeling of exaltation at one time, and a feeling of depression at others. She claimed at one time to be the smartest woman in the world. When about to present a check at a bank at Topeka, she claimed that she did not need to be identified; that she was Mrs. Davis and known all over the United States. "In a few minutes she was as far above ecstasy as she was below normal in despondency." She was ambitious to acquire a territory of land eight miles wide and fifteen miles long. According to the witness Scherk, she would, after talking about land matters in the later years of her life, turn her conversation on to the subject of poetry and songs which she was writing. She composed a poem called Bad Water Valley and dwelt on it for weeks, and caused her song to be sung by a "radio crooner". "She would just act all worn out; felt dead, would say " 'I don't know why God left me on this earth; I don't know why he didn't let me go, when I wanted to go." At one time, while decedent was still living on the ranch, the neighbors feared for her safety; feared that she would freeze to death. It was late in the fall; there was no wood in the house; she was alone. So Scherk took it upon himself to have her brought to Casper by the sheriff. Thereafter she had someone with her. According to decedent's brother, she often was discouraged and nothing looked bright to her. "She wouldn't say much of anything; would sit and brood. The world was gone to the dogs." She would say, "I don't care; it is all gone to the dickens anyway; let it go." According to Mrs. Barber, a neighbor of decedent for seven or eight years before the decedent died, the latter was physically and

mentally ill a good deal of the time. She asked the witness to be one of the witnesses to her last will; but witness declined, because "she didn't think that decedent was in condition to make a will." Two physicians, in answer to a hypothetical question, testified that the decedent was of unsound mind at the time of the execution of the last will and testament in question.

The contestee produced a number of witnesses, who testified that when they saw the decedent, she acted as a normal person. Some of the witnesses saw her only on one of two occasions, others more frequently. Two physicians testified to the decedent's sanity. However, in deciding as to whether or not the verdict is sustained by sufficient evidence, "it must be borne in mind that the appellate court must assume that the evidence in favor of the successful party is true, leave out of consideration entirely the evidence of the unsuccessful party in conflict therewith, and give to the evidence of the successful party every favorable inference which may be reasonably and fairly drawn from it." Willis v. Willis, 48 Wyo. 403, 429, 49 P. (2d) 670; 4 C. J. 857. As stated in the case of In Re Chevallier's Estate, 159 Cal. 161, 113 Pac. 130, the question is as to whether or not the evidence offered by contestants would, if presented to the jury, have warranted a verdict in their favor. It was held in Davis v. Davis, 64 Colo. 62, 170 Pac. 208, that the jury's verdict, and the approval thereof by the trial court, are of special significance in cases like that at bar. The court said among other things:

"If there is any substantial evidence tending to prove in favor of contestants all the facts necessary to make out their case, they are entitled to have the case go to the jury for a verdict on the merits. Further, that in this class of cases the verdict of the jury is of special importance, and should not be disregarded, except for grave reasons clearly apparent. This for the reason that a jury composed of the average men of

the community sit together, consult, apply their separate experiences of life to the facts proven, and draw a unanimous conclusion. This average judgment thus given is the great effort of the law to obtain. It is assumed that 12 men know more of the common affairs of life than does one man, and that they can draw wiser and safer conclusions from admitted facts thus occurring than a single judge. It has also been observed that in the consideration of such a case the jury not only saw the witnesses, noted their language, appearance, and demeanor on the stand, but that they may have been acquainted with some of the witnesses, knew their relations, present and past, and any probable interest in aiding either party, or inclination to do so. And in a case like the one before us, the jury was probably acquainted with the parties. It has further been observed by the appellate courts of this state that the fact that the trial judge has refused to disturb the finding of the jury is entitled to consideration."

It is stated by Schouler on Wills, etc. (6th Ed.) Sec. 121, that, on the whole, there is no particular degree of mental acumen to serve as the standard of testamentary capacity, and that each case must be decided upon its own facts and circumstances. Counsel for appellant lays stress on the fact that the evidence is undisputed that the decedent was able to take care of her property, and it is said In Re Finkler's Estate, supra, that a will is usually sustained where it appears that the decedent was capable of directing business affairs. We are somewhat uncertain how much stress should be laid upon this fact in the case at bar. The decedent undoubtedly was able to no little extent in directing her business affairs. Still, the estate which was left by her husband had shrunk considerably in her hands. Practically all personal estate left her, consisting of more than fifty thousand dollars, and perhaps twenty thousand more than that, had vanished, and she seemingly had considerable difficulty in managing her affairs without a quarrel with those, or many of those, with whom she came in contact. On the whole,

we cannot in any event give her capability of management of her property such a decisive effect as to overturn the verdict of the jury.

Some of the items of testimony which show her peculiarities are not, of course, of great importance when considered by themselves. All of the testimony must be considered together. Decedent's father died while insane. He committed suicide. Her brother was insane. These facts, by themselves, do not show that the decedent died insane. But decedent herself tried to commit suicide, while feeling despondent, and there can be no doubt that she showed many symptoms which at least border on the symptoms of her insane father and insane brother. The fact that she lost her eyeballs and became blind would further have a tendency to cause her to become more despondent and more depressed; nor does the fact that she learned the so-called Braille system after that. Her extreme fits of anger indicate her abnormal mind. Most striking is the testimony relating to what the jury had a right to find to be insane delusions. She thought that her mother was not her true mother; that her so-called relatives were not such, or at least only of half blood. She distrusted all of them; was suspicious of them; she feared that they would poison her. Her actions about September 1st, 1934, shortly before the execution of the will here contested, when she stayed in an automobile a whole day and night, eating nothing, drinking nothing, for fear that she might be poisoned, were not the actions of a woman of sound mind, if the testimony in this case is to be credited. If she believed her relatives not to be such, she would naturally not want to leave her property to them; that belief would further, naturally, make her suspicious of them. Taking all facts into consideration, we think, that there was sufficient testimony which warranted the jury to find that the testatrix did not have the mental ca-

pacity to execute the will in question, particularly that the will in question was brought about and was the effect of insane delusions in the sense of In re Chevalier's Estate, supra, where the court held that in case of a delusion, the will must be the product thereof; that it must bear directly upon and influence the creation and terms of the testamentary instrument. In Society v. Hopper, 33 N. Y. 624, the court said:

"If a person persistently believes supposed facts, which have no real existence except in his perverted imaginations, and against all evidence and probability, and conducts himself, however logically, upon the assumption of their existence, he is, so far as they are concerned, under a morbid delusion; and delusion in that sense is insanity. Such a person is essentially mad or insane on these subjects, though on other subjects he may reason, act, and speak like a sensible man."

In the case at bar the decedent's relatives were all, in effect, disinherited. The jury had a right, we think, under the evidence, to hold that the disposition of decedent's property was not natural, and it is said in 68 C. J. 1087, that "an unnatural disposition affords some evidence of testamentary capacity, and in combination with other circumstances may be sufficient to carry the issue to the jury." And in 68 C. J. 1087 it is said that "evidence of the testator's insanity or insane delusions with respect to his family, where affecting his will, may be sufficient to carry the issue of testamentary capacity to the jury."

2. Dr. L. D. Johnson was called as an expert witness to testify to the sanity or insanity of the decedent. A hypothetical question was asked, containing substantially the facts testified to by witnesses for the contestants. The question was objected to on the ground —as now argued— that it omitted some facts which should have been included. It is claimed it should have embodied the fact that the decedent learned the Braille system and some testimony tending to show that it

was possible to quiet the decedent when she had angry spells. The court overruled the objection, stating that opposing counsel could bring out the necessary facts on cross-examination. The ruling is claimed as error. Counsel cite us particularly to Nichols on Applied Evidence, Vol. 2, page 2079, and note in 18 Am. & Eng. Ann. Cas. 646. The authorities cited are against counsel's contention. Nichols, supra, states:

"Hypothetical questions may be framed either upon all the facts of the case, or upon part of the facts. All the evidence on the subject need not be embodied in the question, nor all the facts claimed to have been proven by the adversary. An objection that the opinion was not founded upon all the facts of the case goes to the weight of the evidence rather than to its competency or materiality. If opposing counsel thinks the question does not incorporate all of the facts in evidence, he can include them in questions propounded by himself. In some states, however, there are cases holding that all the disputed facts of the case must be included in a hypothetical question."

In 18 Am. & Eng. Ann. Cas. 648, it is said:

"The rule announced in the reported case, that a hypothetical question need not include all the proven facts on the particular subject on which the experts opinion is to be given, but that counsel may embrace in his hypothetical question such a combination of facts as he may deem established by the evidence, and take the opinion of the expert witness thereon, leaving to the opposing counsel, if he does not deem all the established facts to be included in the question, to include them on cross-examination of the witness, is supported by the weight of authority. * * * * As applied in the reported case, the general rule has frequently been applied where the hypothetical question involved a question of insanity or mental condition."

Wigmore on Ev. (2nd Ed.) Sec. 682, states:

"For reasons of principle, then, and to some extent of policy, the natural conclusion would be that the questioner need not cover in his hypothesis the entire body

of the testimony put forward on that point by him or by the opponent, but may take as limited a selection as he pleases and obtain an opinion on that basis. Such is the orthodox doctrine as applied by most courts."

The view above expressed is sustained by Phifer v. Baker, 34 Wyo. 415, 244 Pac. 637, 650. Professor Wigmore adds in his discussion in the section cited, that the court may well interfere at times to prevent an abuse. No such abuse is shown in the case at bar. The contention here discussed must, accordingly, be overruled.

3. Contestee complains of the fact that the court refused to instruct the jury to the effect that no evidence was introduced showing that the decedent suffered from any form of delusion or hallucinations; and that no evidence was introduced showing that the decedent suffered from any general form of insanity. As we have already indicated, the instructions asked to that effect were rightly refused. There was sufficient evidence from which the jury might infer either of these forms of insanity.

4. The court was further asked to give the jury the following instructions:

"A-1. The jury is instructed that the form of insanity which will render a will invalid is: (1) General mental incompetency existing at the time of executing the will and general mental incompetency means inability of the testatrix to understand the nature of her act in signing her will and to know the extent of her property affected by her will and the persons who are related to her and who might have a claim upon her bounty;or (2) to some narrower form of insanity to which the testatrix is the victim of some hallucination or delusion, and in case the testatrix is suffering under some hallucination or delusion the will must have been produced in whole or in part by the delusion."

"A-6. The jury is instructed that a delusion indicating testamentary incapacity must spring up spon-

taneously in the mind of the testatrix and not by the result of extrinsic evidence of any kind."

"A-7. The jury is instructed that while sufficient mind and memory to attend to the ordinary business affairs of life makes one competent to make a will, such a test is higher than the law requires. Less capacity is needed to make a will than is sufficient in most cases to transact ordinary business."

"A-8. The jury is instructed that a person may have a bad temper and under its influence say and do wrong and unnatural things and still not labor under an insane delusion as to objects of her hostility or bounty."

"A-11. The jury is instructed that a testatrix has sufficient testamentary capacity if she has sufficient mental capacity to understand: (1) The nature of her act in signing her will, (2) To remember her relation to persons who have claim upon her bounty."

The refusal to give these instructions is assigned as error. The court, on its own motion, gave the jury, among others, the following instructions:

"3. The jury are instructed that when a will is proved, including soundness of mind and memory on the part of the testatrix, by the testimony of two or more subscribing witnesses, as in this case, and unsoundness of mind is alleged as a ground for setting the will aside, the fact of insanity, or of unsoundness of mind must be established with reasonable certainty; that is, the evidence of insanity should preponderate, or the will must be taken as valid. If there is only a bare balance of evidence, or a mere doubt only, of the sanity of the testatrix, the presumption in favor of sanity, if proved as above stated, must turn the scale in favor of the sanity of the testatrix."

"4. The court instructs the jury that the law presumes, and it is your duty to presume, that every woman who has arrived at the age of discretion is of sound mind and memory and capable of transacting ordinary business and capable of disposing of her property by will or otherwise, until the contrary is shown, and the court instructs you that it is your duty to hold that Jozina Davis-Robinson at the time she executed the will offered in evidence was of sound mind and mem-

ory, and so to hold until you believe by the preponderance of the evidence that she was otherwise."

"6. The jury is instructed that unsound mind, as used in the Will Statutes of the State of Wyoming, is a broad, comprehensive and generic term of ambiguous import. In a medical sense, it is used to denote any deranged condition of the mind and every .degree of mental unsoundness, whatever may be its source or cause. But mere proof of mental derangement, in a medical sense, is not sufficient to invalidate a will. Not every degree of mental incapacity, unsoundness or mental weakness will suffice to destroy testamentary capacity. It must be of such a severe character as to have destroyed the ability of the testatrix to understand the nature and effect of her act in signing and executing her will, and to destroy her mental power to such an extent that she does not comprehend and realize the effect of her will upon her property which she is attempting to dispose of by will, and that she is not capable of properly understanding and appreciating any obligation that she may owe to any relative or person who might have a moral claim upon her bounty."

Counsel have not cited us to any cases which have held that the refusal to give either of the instructions asked as above, is prejudicial error. Counsel for contestee assumes that merely because a requested instruction is correct as an abstract proposition of law, it is prejudicial not to give it. That is not the law. 3 Am. Jur. 627. The court should, of course, instruct the jury on the basic fundamental rules applicable to the facts in issue, particularly if requested to do so. 3 Am. Jur. 622. But requests for instructions which go beyond that point stand on a different footing. Unless the refusal to comply therewith is prejudicial and affects the substantial rights of the complaining party, it cannot be held to be reversible error. Section 89-1064, Rev. St. 1931. Turning now to the requests here under discussion, it is obvious that A-11 is of no importance, and is fully embodied in the instructions given by the court. If the court had given A-1, specifi-

cally calling attention to the fact that insanity may consist of delusions, it would, we think, have injured, rather than helped the contestee. Request A-6 is so indefinite and uncertain in its terms that we do not think it would in any way have aided the jury in solving the problem before them. A-7 and A-8 merely call attention to certain specific matters relative to insanity. We think that these matters were sufficiently covered by instruction No. 6 given by the court.

5. The contestee asked the court to give the jury the following instructions:

"A-5. The jury is instructed that relative to the testimony of the subscribing witnesses to the will, that the law presumes that such subscribing witnesses had their attention directed to and noted the mental capacity of the testatrix, Jozina Davis-Robinson, and that by reason thereof their opinion is entitled, and the jury should give their opinion more weight than should be given the opinion of a witness whose observations were merely casual."

The court refused to give this instruction and this is assigned as error. The court told the jury that "it is the exclusive province of the jury to weigh and consider all evidence which is presented to it, to determine the credibility of all witnesses who have testified before you." No exception was taken to this instruction. It is inconsistent with the instruction asked, and we are not certain that we should not hold that request A-5 should be considered waived.

It is ordinarily, at least, true, that the credibility of the witness is within the exclusive province of the jury. 64 C. J. 899. And such instruction has been held proper in a case of a will-contest. Hall v. Burpee, 176 Ga. 270, 168 S. E. 39. Counsel asks us to declare that an exception exists in cases like that at bar. And there are authorities to that effect. In re Visaxis' Estate, 95 Cal. App. 617, 273 Pac. 165; In re Estate of Holloway,

195 Cal. 711, 235 Pac. 1012; Alexander, Commentaries on the Law of Wills, Sec. 382; see Randall's Instructions to Juries, Sec. 382; 68 C. J. 1124. Notwithstanding the eminent authorities announcing this exception, we cannot agree. It is a common practice to call in witnesses to a will who know little or nothing about a testator, and whose opinion of the mental capacity of such testator would be worthless. That is, of course, not always true, but frequently. It would, we think, be dangerous to lay down any general rule such as asked by counsel for contestee. The reasons were stated so clearly in the case of Turner v. Cheesman, 15 N. J. Eq. 243, 261, that we have little to add. There the court stated:

"The mere fact of a man's having affixed his signature to a will as a subscribing witness does not, it appears to me, of itself entitle his opinion, as to the competency of the testator, to any more weight than that of any one else who may be called upon to testify. If the subscribing witness is a stranger, which is sometimes the case, called upon to meet the exigency of the moment, and having no opportunity in a sick chamber to ascertain and judge of a man's capacity, his opinion is not certainly entitled to as much weight as that of a friend who saw the testator about the same time, and who was afforded an opportunity of conversing with him and and testing the sanity of his mind. The opinion of a subscribing witness is entitled to weight from the same consideration as that of any other man who is not a subscribing witness. The means which he enjoys of forming a correct opinion gives weight to his opinion. The opinion of any one—whether a subscribing witness or not—is but of little value, unless he can give us the reasons for the opinion he expresses, and can show that he had an opportunity to justify him in forming the opinion he expresses. If the subscribing witnesses are acquaintances and friends of the testator, familiar with his peculiarities; and if, added to this, they are men of intelligence, and at the time were afforded an opportunity of judging of the testator's state of mind, their opinion would be entitled to very

great and controlling consideration. It is often said that subscribing witnesses are those called by the testator himself to attest to his capacity; and that, on this account, the law attaches great weight to their opinion. But it most frequently happens that a testator gives it very little thought as to who are the witnesses of his will, and in fact has nothing to do with selecting them, but leaves it altogether to the scrivener who draws his will. An individual, called into a sick chamber to witness the will of an invalid, would be thought destitute of good breeding and impertinent should he propound any question for the purpose of testing the sanity of the man whose will he is called upon to attest. Such an occasion is regarded as a mere business one, and is dispatched with little ceremony, and most frequently without any opportunity being afforded of judging of the state of mind of the man who executes the instrument. Whether a subscribing witness or not, we must look at the intelligence of the man, and the means he enjoyed of forming the opinion which he advances, and give weight to his opinion accordingly."

As illustrating the situation in the case at bar, we may take for instance the testamony of Mrs. Jourgenson, one of the attesting witnesses to the will. She stated her age, that she had known the decedent for better than two years; that she was asked to sign the will as a witness; that she did so; that the decedent appeared to be of sound mind and memory. It does not appear how well she was acquainted with the decedent, how often she had seen her or what opportunity she had had to observe the testatrix. To instruct the jury that her testimony should outweigh the testimony, for example, of Mr. Scherk, who had known the decedent for a long time, was intimately associated with her almost to the time of her death and had many transactions with her, or the testimony of Mrs. Barber, a close neighbor, who was with the decedent day after day and knew her life, conduct and actions intimately, and who refused to be a witness to the will because she did not believe the testatrix to be of sound mind, would

seem to border on the absurd. If it were shown that the witnesses to the will were well acquainted with the decedent, knew of her temperament and conduct in general, and had good opportunity to observe the testatrix while the will was executed, then, it may be, an inference or presumption might be drawn that their testimony should have greater weight than that of other witnesses who did not have the same opportunity. But the unqualified rule, as stated by some authorities, as above mentioned, cannot be sanctioned. Soundness of mind is not tested alone by the appearance at one particular moment. State v. Carroll, 69 Pac. (2d) 542, recently decided by this court; Wigmore Ev. (2nd Ed.) Sec. 228.

6. Contestee asked the court to give the following three instructions, all containing substantially the same thought:

"A-2. The jury is instructed that even if the provisions of this will do not conform to the jury's ideas as to how the testatrix should have devised her property, yet that is not sufficient to invalidate the will. A mentally competent person is permitted to make a will leaving his or her property to any person or persons he or she may desire."

"A-9. The jury is instructed that the mere fact the provisions of this will do not conform to the jury's ideas as to how the testatrix should have devised her property, yet that is not sufficient to invalidate the will. No person is bound to make a will in such a manner as to deserve approbation from the prudent, wise or good; such a person may even be capricious."

"A-10. The jury is instructed that under the laws of the State of Wyoming the only person who can not be deprived of the right of inheritance by a testatrix is the surviving spouse, if there be one, and a sister is under no obligation to provide for her brothers and sisters either when living or by will."

These instructions are correct as abstract propositions of law. It was held in Estate of Martin, 170 Cal.

657, 151 Pac. 138, that it was error to refuse to instruct the jury that the heirs had no vested rights in the property of their ancestor because of their relationship. And in the case of In re Visaxis' Estate, supra, it was held error to refuse to instruct the jury that an uncle is under no obligation to provide for his nephews. See also Hall v. Burpee, supra. In Davis v. Davis, 64 Colo. 62, 170 Pac. 208, and Aquilini v. Chamblin, 94 Colo. 367, 30 P. (2d) 325, an instruction to the effect that a testator has the right to make such disposition of his property as he deems best was held not erroneous. And we are not now prepared to hold that we should have held it error, if the court had given the instructions asked as above mentioned. At the same time, it must be borne in mind that it is almost the universal rule that the jury have the right, in determining the mental capacity of testator, to take into consideration the provisions of the will, and whether they are just, reasonable or natural. 1 Redfield on Wills, 516; 1 Schouler on Wills, etc., (6th Ed.) Sec. 195; Alexander, Commentaries on the Law of Wills, Sec. 355; 68 C. J. 1087; Hollenbeck v. Cook, 180 Ill. 65, 54 N. E. 154; Brown v. Lane, 15 Ohio App. 321; In re Gunderman's Estate, 102 Nebr. 590, 168 N. W. 359; Davis v. Frederick, 155 Ga. 809, 118 S. E. 206; Lewis v. Martin, 210 Ala. 401, 98 So. 635; Rice v. Rice, 92 Ind. App. 640, 175 N. E. 540. Contra: In re Bliss Estate, 247 Mich. 389, 225 N. W. 576. Schouler, supra, states that "whenever, in short, such will exhibits a decided perversion from the normal and natural disposition, thought and feelings of the testator, while in his right mind, there is good reason to conclude it the offspring of insanity." Redfield, supra, states that "where the will is unreasonable in its provisions * * * this of itself will impose upon those claiming under the instrument, the necessity of giving some reasonable explanation of the unnatural character of the will, or,

at least, of showing that its character is not the offspring of mental defect, obliquity or perversion." Hence it has been held that it is proper for the court to give an instruction on the subject, and that is true not only in cases involving descendants but also where the heirs at law are sisters, brothers, nephews and nieces. In re Brown's Will, 194 N. C. 583, 140 S. E. 192; Conway v. Vizzard, 122 Ind. 266, 23 N. E. 771; see also Appeal of Sturdevant, 71 Conn. 392, 42 Atl. 70. The instructions asked in the case at bar omit any mention of the justness or naturalness of the will, and had a tendency to give the jury to understand that these elements had nothing to do with the case. Hence it has been held, either that it is error to give instructions of similar import as those asked herein, without mentioning that the jury have a right to take the justness, etc., of the provisions into consideration, or that it is not error to refuse such instructions.

In the case of Kettemann v. Metzger, 23 Ohio Cir. Ct. Rep. 61, the contestee of a will requested the court to give the following instruction:

"It is the right of every man, which right cannot be taken from him, to do what he desires with his own, unless the disposition he makes violates some law; and after his death, neither court nor jury have the power to make for him a disposition of his property different from the disposition which he intended to make, upon any theory that such intended disposition was unjust and wrong."

The court, in holding that there was no error in refusing to give this instruction, stated in part as follows:

"To say to the jury that 'it is the right of every man, which cannot be taken from him, to do what he desires with his own, unless the disposition he makes violates some law,' where the two chief questions in the case were whether the testator was of unsound mind or not, and whether he was acting under undue influence at

the time he made his will, would be misleading, because it leaves out entirely the question of undue influence and mental capacity. The will of John Kettermann was to be sustained if he had sufficient mental capacity to make a will when he signed it, and if he was not under undue influence of such a character as would make the will not his will, but the will of some other person. The request, after what I read, proceeds, 'And after his death, neither court nor jury have the power to make for him a disposition of his property different from the disposition which he intended to make, upon any theory that such intended disposition was unjust and wrong.' That part of the request is probably a correct statement of an abstract proposition of law. The whole request is really an abstract proposition of law, and is not made to apply directly to the case on trial. But while the latter part is abstractly correct, still, the jury would have the right to consider in a will contest, along with all other facts and circumstances, whether the will was unjust or wrong, in determining whether or not it was in fact the will of the testator. While a man has a right to make an unjust will, or one which in the common judgment of mankind is called wrong, still, in determining the question whether the paper writing is in fact the will of the man, the jury have the right to consider whether he would, if he was sound mentally, make such a will. On the whole, we think there was no error in refusing this request; and we find no error in the refusal to give the other requests which were refused."

In the case of Lane v. St. Denis, etc. Church, (Mo. App.), 274 S. W. 1103, the court gave the following instruction: "The court instructs the jury that a person of lawful age and of sound mind has the right to dispose of her property by will as she chooses, even to the entire exclusion of those who, but for the will, would be heirs of her estate; and that the jury are not to consider whether the disposition made by the testatrix is appropriate or inappropriate but simply whether the paper propounded as her will, be or not be her last will and testament." The giving of this in-

struction was held error, and the court, quoting from Everly v. Everly, 297 Mo. 196, 249 S. W. 88, 91 ,said:

"The question of mental capacity involves whether the testator's mind was in such condition that he recognized his obligation to the objects of his bounty and their relation to him. Undoubtedly a very unjust disposition of his property, a disposition which would disinherit a deserving child, would be some indication of failure to understand his obligation to the child."

In the case of McCommon v. McCommon, 151 Ill. 428, 38 N. E. 145, the court instructed the jury as follows: "The only question that you are to try and determine is, whether the writing produced in evidence is or is not the will of George Cornman; and in passing upon this question, you have nothing whatever to do with the propriety or impropriety of the bequests mentioned in said writing, or as to whether said bequests were just or unjust, or as to whether such bequests should or should not have been made. The maker of a will is his own judge as to its justness and fitness, and he has full and complete power under the law to dispose of his property as he sees fit, and to deprive his relatives of the enjoyment of any part or all of his estate, even though they may be poor and in needy circumstances. And if you believe from the evidence that at the time George Cornman executed said writing he was capable of transacting ordinary business, and was under no constraint, then you should find that the said writing is the will of said George Cornman."

The court, in commenting on this instruction, states among other things:

"It is doubtless the rule, that a person of sound mind and memory, and subjected to no constraint or undue influence, may dispose of his property by will as he sees fit. He may make those to whom he is bound by

ties of natural affection or moral duty the objects of his bounty, or he may bestow his entire property upon strangers. The mere fact, that one disposition of his estate is made rather than another, can, of itself, have no tendency to impeach the validity of his will. In other words, his testamentary capacity and his freedom from undue influence being conceded, the propriety or impropriety of his bequests or devices is a matter with which courts and juries have nothing to do. But where fraud, undue influence or want of testamentary capacity is charged, all the surrounding facts, including the bequest itself, its propriety or impropriety, its reasonableness or unreasonableness, in view of the situation, relations and circumstances of the testator, may be considered, as bearing upon the issue thus raised. On this subject, Mr. Redfield says: 'Where the will is unreasonable in its provisions, and inconsistent with the duties of the testator, with reference to his property and family, or what the civilians denominate an inofficious testament, this, of itself, will impose upon those claiming under the instrument the necessity of giving some reasonable explanation of the unnatural character of the will, or, at least, of showing that its character is not the offspring of mental defect, obliquity or perversion.' 1 Redfield on Wills, 516. * * * Another meaning of the instruction, which seems to us to be the most obvious one, is, that in determining whether the instrument in question is the will of the testator—a question which necessarily involves the subsidiary questions, whether the testator, at the time he executed the instrument, was in possession of testamentary capacity, or was subject to undue influence, or was the victim of fraud—the jury should not consider the propriety or impropriety of the bequests, or whether they were just or unjust, or whether they should or should not have been made, as bearing upon those questions. If the instruction had stood alone, this, most probably, is the meaning in which the jury would have understood it, and its effect, therefore, would have been to withdraw from their consideration material and competent evidence, in determining whether the instrument produced was the will of the testator or not."

In the case of Everly v. Everly, 297 Mo. 196, 249 S. W. 88, the court stated:

"Complaint is made of Instruction numbered 2-D, given on behalf of the defendant: 'James M. Everly, if of sound mind as defined in these instructions, had the right to dispose of his property by will as he chose; this is the lawful right of every person possessed of sufficient mental capacity to make a valid will, even to the exclusion of those who, but for the will, would have been heirs to his estate; so it makes no difference what disposition he made of his property, whether appropriate or not, or whether in your opinion just. You have only to consider whether the paper writing produced as his will, be, or be not his will.' It is argued by respondent that an unnatural or an unjust disposition of property is not material to the issue of mental capacity, but would only be material where the issue was of undue influence. The question of mental capacity involves whether the testator's mind was in such condition that he recognized his obligation to the objects of his bounty and their relation to him. Undoubtedly a very unjust disposition of his property, a disposition which would disinherit a deserving child, would be some indication of failure to understand his obligation to the child. This court, in the recent case of Ray v. Walker, 293 Mo. 1 c. 468, in a consideration of the question of undue influence and *testamentary capacity* and the relation to the testator of the objects of his bounty, said: 'The provisions of the will, its recitations and all the environments and circumstances of the case are to be considered by the jury.' The court quoted from Schouler on Wills, in Meier v. Buchter, 197 Mo. 1. c. 89: 'But in order to sustain any unjust, unnatural, or absurd will, which may be contested, fair proof at least should be afforded that the testator was of *sufficient capacity* at the date of execution *to comprehend its import*. . . . In fine, a harsh and unnatural disposition by the will in question, *is circumstance which tends to discredit the maker's testamentary capacity*.' On these authorities we think the instruction given was erroneous."

On the other hand, it has been held that an instruction of similar import as those asked herein may be

given, provided that the court also instructs the jury that the provisions of the will, its justness ,etc., may be taken into consideration by them in determining the mental capacity of the testator. Conway v. Vizzard, supra; McCommon v. McCommon, supra; Howe v. Richards, 112 Iowa 220, 83 N. W. 909; Larabee v. Larabee, 240 Ill. 576, 88 N. E. 1037; Lehman v. Lindenmeyer, 48 Colo. 305, 109 Pac. 956. In the last cited case the court said:

"The following was given as a part of instruction No. 13: 'If a party makes a will contrary to natural justice, this, with other facts, may be considered; but the mere fact that a will is not exactly according to what our own conception of justice would be is not of itself sufficient to invalidate a will.' We do not regard this portion of the instruction as proper. It is true that one may dispose of his property as he pleases, and that one may indulge his prejudice against his relations and in favor of strangers, and that, if he does so, it is no objection to his will; and that no one, except a husband or wife, can enforce a natural right to a share in a testator's bounty; but a jury, in determining whether a decedent was capable of disposing of his property by will, has a right to consider that, in disposing of it, he has passed over the natural objects of his bounty, and has bestowed his property upon others."

As already stated, the instructions above mentioned, asked in the case at bar, have a tendency, we think, in giving the impression that the justness and naturalness of a will have nothing to do with the case. That is accentuated by the facts herein. There was testimony tending to show that the testatrix did not, and falsely so, regard her mother to be her true mother; that she did not consider her sisters, brother, nephews and nieces to be such. The effect of that testimony would have been substantially nullified by the instructions above mentioned. The jury would have received the impression that such testimony had no bearing in

the case. We think accordingly, that it was not error for the court, under the circumstances in this case, to refuse to give the unmodified instructions here under discussion.

Finding no error in the record, the judgment herein is affirmed.

*Affirmed.*

RINER and KIMBALL, JJ., concur.